AVALONBAY COMMUNITIES, INC. *v.* ZONING
COMMISSION OF THE TOWN OF
STRATFORD ET AL.
(AC 31982)
(AC 31983)

DiPentima, C. J., and Gruendel and Alvord, Js.

---

caught and knows that there's a gun in the car. That's what I find. So, he's in violation of his probation."

Argued March 7—officially released July 12, 2011

*Timothy S. Hollister*, with whom was *Gian-Matthew Ranelli*, for the appellant-cross appellee (plaintiff).

*Timothy D. Bates*, with whom were *Joel C. Norwood* and *Lauren M. Vinokur*, for the appellee-cross appellant (named defendant).

*Kevin C. Kelly*, for the appellee-cross appellant (intervening defendant Stratford town council).

*Opinion*

ALVORD, J. The defendant zoning commission of the town of Stratford (commission) denied a site plan application filed by the plaintiff, AvalonBay Communities, Inc., for a residential development that included affordable housing units. On appeal from the commission's decision, the trial court dismissed the plaintiff's appeal.

The plaintiff appeals from that judgment, claiming that the court improperly concluded that the commission's denial was proper on the stated ground that emergency access to the proposed development via the Merritt Parkway underpass was inadequate. The commission filed a cross appeal, claiming that the court improperly concluded that the plaintiff's proposed use of Circle Drive as a secondary emergency access route and the commission's concerns about wetlands did not provide adequate reasons for the denial of the plaintiff's affordable housing application. The defendant town council of the town of Stratford (town) is an environmental intervenor pursuant to General Statutes § 22a-19. The town also filed a cross appeal, claiming that the court improperly failed to conclude that the plaintiff's proposed activities in connection with its 2008 site plan would result in substantial negative impacts to the natural resources and wetlands of the state.[1]

---

[1] In 2003, the town filed a motion to intervene in the trial court proceedings arising from the plaintiff's appeal from the commission's 2001 denial of the plaintiff's affordable housing application. The plaintiff filed a motion to strike the town's petition to intervene, and the trial court, *Shortall, J.*, filed a memorandum of decision granting the motion to strike. The town appealed to this court. We reversed the trial court's decision, having concluded that § 22a-19 (a) permitted the town's intervention. *AvalonBay Communities, Inc.* v. *Zoning Commission*, 87 Conn. App. 537, 541, 867 A.2d 37 (2005), aff'd, 280 Conn. 405, 908 A.2d 1033 (2006). That decision was affirmed by our Supreme Court. Id. The case had proceeded to judgment in the trial court, *Bryant, J.*, while the town's appeal from the granting of the motion

We agree with the plaintiff that the record supported its claim that the Merritt Parkway underpass provided sufficient access to the proposed development for emergency vehicles and that the court improperly concluded that the commission's concerns about the underpass provided an adequate basis for the denial of the plaintiff's affordable housing application. We concur with the court's conclusion, however, that the commission improperly denied the application with respect to perceived concerns about Circle Drive and the environment. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The record reveals the following facts and procedural history of this case. These facts were set forth in an opinion of our Supreme Court, in which it dismissed the commission's prior appeal from Judge Bryant's decision; see footnote 1 of this opinion; because it had not been taken from a final judgment. *AvalonBay Communities, Inc.* v. *Zoning Commission,* 284 Conn. 124, 931 A.2d 879 (2007). "In May, 2000, the plaintiff, a developer of luxury residential apartment complexes, entered into a contract to purchase a 11.99 acre parcel of land located at 1600 Cutspring Road in Stratford (Cutspring property). The Cutspring property, which currently is zoned for residential use, is bounded by the Merritt Parkway to the south, Cutspring Road on the west, Circle Drive and several single-family homes to the north and Pumpkin Ground Brook on the east. The Cutspring property is located in a section of town that is accessible only via a section of Cutspring Road that runs underneath the Merritt Parkway (underpass).

"In September, 2000, the plaintiff submitted to the commission three applications seeking approval to construct an affordable housing development on the

to strike was pending. *AvalonBay Communities, Inc.* v. *Zoning Commission,* 280 Conn. 405, 411, 908 A.2d 1033 (2006). The town was permitted to participate in the appeal from Judge Bryant's decision in order to raise environmental issues. *AvalonBay Communities, Inc.* v. *Zoning Commission,* 284 Conn. 124, 125 n.1, 931 A.2d 879 (2007).

Cutspring property. In accordance with [General Statutes] § 8-30g, the plaintiff filed with the commission: (1) a proposal to amend the town's zoning regulations to create a 'mixed income housing development' district zone for higher density residential use; (2) a proposal to change the town's zoning map to place the Cutspring property in the proposed new zone; and (3) a site plan for its project, to be known as 'Avalon at Stratford.' The plaintiff proposed to construct 160 residential rental units located in six buildings to be built on the Cutspring property, as well as a clubhouse, pool and recreation area, recycling center and parking for 320 vehicles. The affordability plan submitted by the plaintiff as part of its application to the commission demonstrated that the development met the criteria for an affordable housing development set forth in § 8-30g (a) (1) (B) . . . because 25 percent of the units would be affordable to low and moderate income households for thirty years. The plaintiff also submitted to the commission reports demonstrating that the commission's decision regarding the application would not be exempt from the appeal procedures provided by § 8-30g because, in 2000, only 8.22 percent of the town's housing units qualified as affordable. See General Statutes (Rev. to 1999) § 8-30g (f) (statutory appeal procedures not available if property located in municipality in which 10 percent of properties qualify as affordable). After a public hearing, the commission unanimously voted to deny all three of the plaintiff's applications, citing the following public health and safety concerns: (1) fire safety; (2) traffic; (3) internal circulation and site design; (4) density; and (5) wetlands.

"In May, [2001], pursuant to § 8-30g (d), the plaintiff submitted revised applications to the commission.[2] The

---

[2] Also in May, 2001, the plaintiff filed a revised application for a wetlands permit for this proposed development with the inland wetlands and watercourses agency of the town of Stratford (wetlands agency). The wetlands agency denied the revised application, and the plaintiff appealed from that decision to the Superior Court. On January 11, 2005, the trial court reversed

modifications to the site plan included, inter alia: (1) reducing the number of residential units from 160 to 146; (2) reducing the number of residential buildings from six to five; (3) moving one building further away from the wetlands surrounding Pumpkin Ground Brook; (4) improving access to the rear of the buildings; (5) increasing the width of the driveway; (6) increasing the number of parking places; and (7) purchasing an abutting parcel north of the Cutspring property, located at 140 Circle Drive, for use as a secondary emergency access to the site. On July 12, [2001], the commission held a public hearing on the plaintiff's resubmission. Experts for the plaintiff and the town's various governmental departments offered testimony about the changes made to the application as they related to the public health and safety concerns identified by the commission in its denial of the plaintiff's original application, but most of the discussion focused on the commission's concerns about fire safety.

"As a result of this discussion during the hearing, the plaintiff agreed to several additional changes to its amended site plan, including: (1) widening the secondary emergency access driveway by four feet to twenty feet; (2) widening the entrance to the development from Cutspring Road by five feet to forty feet; (3) installing sprinklers on all decks and patios; and (4) striping portions of the driveway as fire lanes to prevent parallel parking. Thereafter, the commission again unanimously denied the revised applications, citing in its denial of the site plan application largely the same reasons that

the decision of the wetlands agency and remanded the matter "for further consideration of any conditions that should be attached to the issuance of the permit as supported by evidence in the present record." After its petition for certification to appeal was granted, the wetlands agency filed an appeal with this court. We heard oral argument on the wetlands appeal on March 7, 2011, and the decision in that appeal was released on the same date as this opinion. *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, 130 Conn. App. 69, 23 A.3d 37 (2011).

had caused it to deny the original application, all grouped under concerns about fire safety, traffic safety, internal circulation and site design, density and wetlands.

"The plaintiff appealed to the [Superior Court], challenging the denial on the ground that the commission had failed to show that its reasons for denying the applications were supported by sufficient evidence in the record and clearly outweighed the need for affordable housing in the town. The commission argued in response that its reasons for denial were based on public health and safety concerns that sufficiently were supported by the record, that the concerns outweighed the need for affordable housing, and that the concerns could not be addressed through reasonable changes to the plaintiff's application. After two days of hearings, the trial court, *Bryant, J.*, issued a memorandum of decision concluding that, of the commission's five reasons for denying the revised applications, fire safety was the only public health and safety concern that was supported by sufficient evidence in the record and outweighed the need for affordable housing.[3] Specifically, the trial court found that the commission had shown that there was sufficient evidence in the record to support its claim that the underpass, 'the height of the individual apartment buildings in the proposed site, the inadequacy of Circle Drive to handle emergency vehicles and equipment and the internal turning radii of the driveways pose health and safety concerns,' and that

---

[3] "The trial court also concluded that the commission had failed to carry its burden of showing sufficient evidence to support its denial of the application based on its concerns about traffic safety and inadequate recreational areas. The court also found that although the commission had shown sufficient evidence to support the remainder of its density concerns and its concerns about on-site circulation and wetlands, it failed to show that protecting such concerns clearly outweighed the need for affordable housing or that its concerns could not be addressed with reasonable changes." *AvalonBay Communities, Inc.* v. *Zoning Commission*, supra, 284 Conn. 132 n.8.

the public interest in health and safety clearly outweighs the need for affordable housing, because 'the impediments to emergency vehicle and equipment access to the site and to the rear and upper floors of certain buildings proposed to be constructed on the site pose grave risks to the health and safety of prospective residents.' The trial court, however, then stated that the commission had failed to carry its final burden under § 8-30g (g), because it had 'failed to prove that the denial was necessary as there is insufficient evidence to prove that the public interest could not be [protected] by reasonable changes to the affordable housing development plan.'

"The trial court continued: 'If the roads are too narrow, the buildings too high and the buildings too close to the slopes, it stands to reason that widening or relocating roads and shortening and relocating buildings would eliminate or sufficiently reduce health and safety concerns so that the public interest can be served and the affordable housing can be built. The record does not contain sufficient evidence of those parameters. The . . . commission is in the best position to identify the structural, environmental, equipment and technical context into which the development must be designed to fit. . . . The . . . commission bears the burden of proving that the public interest cannot be protected by reasonable changes to the applicant's proposed development.' . . . Accordingly, the trial court remanded the case to the commission 'with an order that it specify categorically the changes reasonably necessary to protect the substantial health and safety concerns cited as reasons for its denial.' " *AvalonBay Communities, Inc.* v. *Zoning Commission,* supra, 284 Conn. 129–34.

The commission filed a certified appeal from that decision to this court, and the Supreme Court transferred the appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Id., 129 n.3. The

Supreme Court dismissed the appeal for lack of a final judgment because the remand order of the trial court "implies that the trial court intended to require the commission to conduct further evidentiary proceedings on remand." Id., 140. Furthermore, and more importantly, the trial court's order "did not explicitly decide the ultimate issue in this case for the plaintiff. The trial court did not order the commission to grant the plaintiff's application, nor did it state that the commission was stripped of the power to deny the plaintiff's application. . . . Therefore, because the commission apparently retained its discretion with regard to the ultimate issue in this matter, the trial court did not render a final judgment . . . ." Id.

After the Supreme Court dismissed the commission's appeal, the plaintiff submitted a revised site plan[4] to the commission on March 7, 2008.[5] The 2008 revisions to the site plan included, inter alia: (1) further reducing the number of residential units from 146 to 130; (2) widening the internal driveways, with increases in the turning radii; (3) reducing the number of parking places; (4) moving two buildings and a detention basin further back from the boundaries of the wetlands; (5) reducing the amount of impervious coverage; (6) providing access to the rear of all of the buildings for fire trucks and equipment; (7) providing additional sprinklers in

---

[4] When the plaintiff submitted the 2008 site plan for its proposed development to the commission, it did not pursue its previous proposal to amend the town's zoning regulations to create a new zone for higher density residential use or its previous proposal to change the town's zoning map to place the subject property in the new zone. Instead, as indicated by the plaintiff, it elected to proceed with its application for site plan approval only, without first seeking a zone change. The plaintiff cites *Wisniowski* v. *Planning Commission*, 37 Conn. App. 303, 311–18, 655 A.2d 1146, cert. denied, 233 Conn. 909, 658 A.2d 981 (1995), as support for this procedure.

[5] The plaintiff chose to file, and the commission agreed to accept, the revised site plan in order to provide a framework for the remand proceeding before the commission. The plan was revised to respond to the emergency access issues identified in Judge Bryant's decision.

all of the buildings for the attic spaces and adding an additional hydrant on site; (8) reducing the amount of earth excavation and filling; and (9) redesigning the buildings so that the bottom of the highest window in the proposed development was thirty-one feet above grade. After a four day public hearing, the commission unanimously voted to deny the plaintiff's 2008 site plan application, citing the following public health and safety concerns: (1) failure to provide adequate, safe and timely emergency access; (2) probable destruction of wetland and watercourse resources; and (3) reasonable likelihood of unreasonable pollution of the waters of the state.

The plaintiff appealed to the Superior Court, claiming that the stated reasons for the denial were not supported by sufficient evidence in the record and did not constitute substantial public interests that clearly outweighed the town's need for affordable housing.[6] In its memorandum of decision filed August 13, 2009, the court, *Cohn, J.*, agreed with the plaintiff's argument that Circle Drive was neither too narrow as to be impassable nor so constricted as to delay response time to a degree that would make it unusable as a secondary emergency access route to the development. The court further determined that the evidence in the record was insufficient to conclude that the impact on wetlands as depicted in the 2001 site plan differed so greatly from the impact on wetlands as depicted in the 2008 site plan so as to require a new assessment of wetlands activity in order to comply with General Statutes § 8-3 (g).[7] The

---

[6] The plaintiff's initial appeal to the Superior Court from the commission's denial of its 2001 affordable housing application was docketed as CV-02-0513808-S. The plaintiff's appeal to the Superior Court from the denial of its 2008 site plan was docketed CV-08-4019273-S. The plaintiff filed a motion to consolidate the two cases, which was granted by the court, *Cohn, J.*, for hearing purposes only, on December 10, 2008.

[7] General Statutes § 8-3 (g) provides in relevant part: "If a site plan application involves an activity regulated pursuant to sections 22a-36 to 22a-45, inclusive, the applicant shall submit an application for a permit to the agency responsible for administration of the inland wetlands regulations not later

court agreed with the plaintiff's argument that if a site plan revision maintains or reduces a previously authorized wetland activity, an applicant is not required to file a new or amended application to comply with § 8-3 (g).[8] Furthermore, the court concluded that even if there had been sufficient evidence to demonstrate that the proposed activities in connection with the site design would adversely impact the environment, there was insufficient evidence in the record to show that the wetlands concerns outweighed the need for affordable housing.[9]

With respect to emergency vehicle access to the proposed development via the Merritt Parkway underpass, the court agreed with the commission that its denial of the affordable housing application was proper on that stated ground. After reciting the arguments of the parties, the court concluded that: (1) the size and height of the development mandates aerial fire truck[10]

than the day such application is filed with the zoning commission. The commission shall, within the period of time established in section 8-7d, accept the filing of and shall process, pursuant to section 8-7d, any site plan application involving land regulated as an inland wetland or watercourse under chapter 440. The decision of the zoning commission shall not be rendered on the site plan application until the inland wetlands agency has submitted a report with its final decision. In making its decision, the commission shall give due consideration to the report of the inland wetlands agency and if the commission establishes terms and conditions for approval that are not consistent with the final decision of the inland wetlands agency, the commission shall state on the record the reason for such terms and conditions. . . ."

[8] The plaintiff cited *Carr* v. *Planning & Zoning Commission*, 273 Conn. 573, 587, 872 A.2d 385 (2005), and *Consolini* v. *Inland Wetlands Commission*, 29 Conn. App. 12, 16, 612 A.2d 803 (1992), in support of its argument.

[9] The court noted that as of 2007, the town's supply of assisted and price restricted housing was 5.25 percent of all dwelling units in the town. In 2000, 8.22 percent of the town's housing units qualified as affordable. *AvalonBay Communities, Inc.* v. *Zoning Commission*, supra, 284 Conn. 130. Accordingly, the percentage of affordable housing units actually decreased from the time of the plaintiff's initial application in 2000 until the submission of its 2008 site plan.

[10] The parties, the trial court and this court have used the terms "aerial fire trucks," "ladder trucks" and "aerial ladder fire trucks" interchangeably.

response; (2) some mutual aid aerial fire trucks will not be able to proceed through the underpass without driving down the center of Cutspring Road; (3) given the low clearance of the archway, aerial fire trucks are likely to proceed slowly while moving through it; (4) response time will be adversely affected; (5) the likelihood of collision with oncoming traffic increases as a fire truck moves to the center of the road; and (6) the underpass could be blocked if there is an accident with oncoming traffic or if the fire truck driver miscalculates the clearance and collides with the top of the archway. For those articulated reasons, the court agreed with the commission's denial of the plaintiff's affordable housing application and dismissed the plaintiff's appeal. The plaintiff filed its appeal, and the commission and the town filed their cross appeals to this court, after we granted their petitions for certification to appeal.[11]

We first set forth the applicable legal principles and standard of review that guide our analysis. "[I]n conducting its review in an affordable housing appeal, the trial court must first determine whether the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. General Statutes § 8-30g (g). Specifically,

We are referring to fire trucks with mechanically operated extensible ladders mounted on them. See "aerial ladder," Merriam-Webster's Collegiate Dictionary (11th Ed. 2005).

[11] The plaintiff appealed from the trial court's judgment dismissing its administrative appeal, and listed trial court docket number CV-02-0513808-S and trial court docket number CV-08-4019273-S on the appeal form. This court assigned docket number AC 31982 to trial court docket number CV-02-0513808-S and AC 31983 to trial court docket number CV-08-4019273-S. The appeals before this court were not consolidated, but were scheduled for oral argument on the same date, together with the appeal of the wetlands agency from the judgment of the trial court reversing the wetlands agency's decision to deny the plaintiff's application for a wetlands permit. See footnote 2 of this opinion. Given the complex prior history of this case, for purposes of this opinion we are treating this case as one appeal from one judgment of the trial court.

the court must determine whether the record establishes that there is more than a mere theoretical possibility, but not necessarily a likelihood, of a specific harm to the public interest if the application is granted. If the court finds that such sufficient evidence exists, then it must conduct a plenary review of the record and determine independently whether the commission's decision was necessary to protect substantial interests in health, safety or other matters that the commission legally may consider, whether the risk of such harm to such public interests clearly outweighs the need for affordable housing, and whether the public interest can be protected by reasonable changes to the affordable housing development." (Internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Zoning Commission*, 271 Conn. 1, 26, 856 A.2d 973 (2004).[12]

## I

## PLAINTIFF'S APPEAL

### Merritt Parkway Underpass

On appeal, the plaintiff claims that the trial court improperly concluded that the height of the arch under the Merritt Parkway, through which emergency vehicles must pass in order to reach the proposed development, would so inhibit aerial fire truck access as to constitute a substantial public safety concern that clearly outweighed the town's need for affordable housing under § 8-30g.[13] Specifically, the plaintiff argues that there was

---

[12] Because the plaintiff's appeal to the trial court is based solely on the record, the scope of the trial court's review of the commission's decision and the scope of our review of that decision are the same. See *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 726 n.29, 780 A.2d 1 (2001).

[13] The plaintiff also claims that the trial court should have concluded that the commission waived its claim that the arch height constituted a substantial public safety concern that justified its denial of the site plan application because it had not raised that issue "in its 2001 denials, its 2002 trial court brief, its 2004 certification petition or its 2005 Supreme Court brief on the merits." The court's August 13, 2009 memorandum of decision does not address the plaintiff's waiver claim. Notably, the plaintiff did not seek an

insufficient evidence in the record to demonstrate that the height of the arch would impede aerial fire truck access to the site. We agree.

The following additional facts are necessary for the resolution of the plaintiff's claim. Cutspring Road, under the archway, is a two-way, two-lane public street with a paved travel surface approximately thirty-two feet wide, with additional five foot pedestrian areas on each side of the roadway. To pass through the archway, a vehicle travels approximately ninety feet. The height of the arch varies, depending on whether it is measured from its center over the middle of the roadway or from the edges of each travel lane. The clearance over the centerline is a minimum of twelve feet, seven inches,[14] and the clearance at the shoulder of each travel lane is approximately twelve feet. The town's primary aerial fire truck, purchased in 2007, is ten feet in height. The town has agreements with neighboring municipalities to provide mutual aid when needed. Those municipalities are equipped with aerial fire trucks, and the likely responder trucks range in height from ten feet, nine inches to eleven feet, eleven inches. It is generally agreed that all aerial fire trucks would fit under the

articulation from the trial court. "It is well settled that [a]n articulation [pursuant to Practice Book § 66-5] is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . The . . . failure to seek an articulation of the trial court's decision to clarify the aforementioned issues and to preserve them properly for appeal leaves this court without the ability to engage in a meaningful review." (Internal quotation marks omitted.) *Chyung* v. *Chyung*, 86 Conn. App. 665, 676, 862 A.2d 374 (2004), cert. denied, 273 Conn. 904, 868 A.2d 744 (2005). Accordingly, we decline to review the plaintiff's waiver claim.

[14] The trial court indicated that the height at that location was twelve feet, three inches. The plaintiff indicated that the court's measurement was referring to the minimum height at the edges of the northbound and southbound driving lanes, and not the area where a vehicle would be traveling down the centerline of the roadway.

underpass, although some of those trucks would have to travel down the center of the road.[15]

In its written denial of the plaintiff's site plan application, the commission recognized that the town recently had purchased a new ladder truck that "can fit under the Merritt Parkway safely without leaving its driving lane." The commission stated that the town's new ladder truck was the only ladder truck it had that could fit safely under the underpass, which would be problematic if that truck was committed to another emergency when needed at the plaintiff's development. Furthermore, the commission concluded that developments of the plaintiff's "type [would] require multiple ladder trucks for fire suppression and rescue," which would require mutual aid assistance. The commission stated that "none of those towns . . . have ladder trucks which could safely pass under the Merritt Parkway." Additionally, the commission stated that "[t]estimony also indicated that the underpass would, at some time in the future, require repair, and [that] repair operations within the underpass would at least close down one half of the travel lane, making ladder truck access impossible for all but one Stratford vehicle."

The commission's written denial acknowledged the plaintiff's argument that there are other residences north of the Merritt Parkway that are currently served by the town's fire department and that those residences can be accessed only through the same Merritt Parkway underpass. The commission responded to that argument: "[S]ingle family residences north of the [Merritt] Parkway have a maximum of two stories and the few bedroom windows in each house can be adequately

---

[15] At oral argument before this court, counsel for the commission conceded that the aerial fire trucks can get through the Merritt Parkway underpass, but argued that the drivers would have to reduce their speed in order to do so. He also stated that the plaintiff's representations with respect to the dimensions of the arch were accurate.

serviced using ground ladders. By proposing three and one-half to four story apartment buildings, [the plaintiff] requires a ladder truck response, and the response time cannot be guaranteed in a safe and timely manner. The persons who will live in the proposed apartments need to know that the response time for emergency vehicles will be timely—not reduced by a need to maneuver through the underpass—and that ample emergency equipment will be available to rescue them if need be."

In the "Conclusions and Accommodations Regarding Emergency Access" section of its denial, the commission concluded: "The Merritt Parkway [underpass] poses a hazard because all but one ladder truck available to service this development cannot fit under the [underpass] without driving down the center of the road, and an apartment fire in this complex would, in all probability, require more than one ladder truck. Further, if the one ladder truck which does fit under the [underpass] were not available, because it was already committed to another service call, no ladder truck in the town or in the towns which would respond by mutual aid, can safely fit under the [underpass]. Adequate ladder truck response is mandated by the height of the structures, and the only accommodation that can be made is to require reduction in the height of all structures to two stories,[16] in line with other structures off Cutspring Road, which are now served without ladder truck calls." Accordingly, the commission denied the plaintiff's affordable housing application due to a lack of adequate emergency vehicle access.

---

[16] Although the denial provided that the plaintiff's buildings should be no higher than two stories, the trial court noted that the commission's trial brief indicated that the reduction should be to a maximum of two and one-half stories, and that the plaintiff's reply brief acknowledged the corrected height. During oral argument before this court, the parties consistently referred to the accommodation as being reduction in height to two and one-half stories.

The trial court, after reviewing the record before the commission, concluded that the evidence presented at the public hearing provided a sufficient basis for the commission's denial. The court noted that the town's fire marshal stated that a fire at a large complex would require the response of multiple ladder trucks. The fire marshal explained that the ability to suppress a fire would be compromised in the absence of aerial apparatus because aerial fire trucks can suppress a fire from an elevated stationary position and can move from window to window to rescue more people than would be possible through the use of ground ladders. The court determined that the commission properly concluded that the size and height of the proposed development mandated aerial fire truck response and that such apparatus would not be able to travel through the Merritt Parkway underpass without driving down the center of the road. According to the court, the aerial fire trucks would have to proceed slowly because of the low clearance, which would cause response time to suffer. The court also stated that there would be a greater likelihood of a collision with oncoming traffic when the aerial fire trucks proceeded down the center of the road and that there was the possibility that a driver would misjudge the clearance and collide with the top of the archway, thereby blocking the underpass. Accordingly, the court upheld the commission's denial of the plaintiff's affordable housing application and dismissed the plaintiff's appeal.

We conclude that the reasons cited by the commission for its denial of the application and the reasons given by the court in upholding that denial are not supported by sufficient evidence in the record. The record does not establish that there is "more than a mere theoretical possibility, but not necessarily a likelihood, of a specific harm to the public interest" if the commission granted the affordable housing application.

*River Bend Associates, Inc.* v. *Zoning Commission,*
supra, 271 Conn. 26. There must be a reasonable basis
in the record for concluding that the denial was neces-
sary to protect substantial public interests, which
means that the record must contain evidence concern-
ing the potential harm that would result if the site plan
application were to be granted and evidence concerning
the probability that such harm in fact would occur. Id.
The record in the present case is devoid of specific
evidence undermining the documentation and opinions
provided by the plaintiff's experts that concluded that
the town's aerial fire trucks and the mutual aid aerial
fire trucks could timely and safely reach the proposed
development through the Merritt Parkway underpass.

The evidence relied on by the commission in support
of its denial on this ground consisted of the following:
(1) the undisputed fact that vehicles must pass through
the Merritt Parkway underpass to reach the proposed
development because it provides the only access; (2)
remarks by the fire marshal that multiple aerial fire
trucks might be needed to fight a fire at the proposed
complex;[17] (3) remarks by the fire marshal that because
of the height of the mutual aid aerial fire trucks, the
drivers would have to be careful and proceed slowly
down the centerline of the road;[18] and (4) remarks by

[17] At the public hearing on June 10, 2008, the fire marshal made the
following remark: "So if we have a large complex, we might have to have
separate aerials around the perimeters of any buildings."

[18] The commission directs us to certain remarks in the record to support
its argument that there is sufficient evidence to support its conclusion that
the height of the arch will delay the response time of emergency vehicles,
thereby endangering public safety.

At the public hearing on January 9, 2001, the transcript, which was made
a part of the record in this case, indicates that Andrew Simms, a professional
engineer, stated that "[f]ire grows very rapidly given a limited oxygen and
a limited fuel, a fire will increase tenfold for every minute that it's allowed
to burn."

At the public hearing on June 10, 2008, the following colloquy occurred
between one of the commissioners and the fire marshal:

"[The Commissioner]: One question while we're on this subject. When
we have the old truck—I know you can't speak for the Nichols fire depart-

counsel for the town at the public hearing that there are cracks in the underpass, that maintenance would be required to repair the cracks and that scaffolding would prevent vehicles from traveling through the underpass.

At the hearing before the trial court in this administrative appeal, the plaintiff countered the arguments of the commission with a recitation of the evidence presented to the commission at the public hearing, including remarks by the plaintiff's experts, with respect to access via the Merritt Parkway underpass. Our review of the record supports the plaintiff's claim with respect to this issue. The uncontradicted evidence established that, although the underpass provides the sole access to the proposed development, this underpass is also the sole access for 160 other residences. The entrance to the subject property is closest to the north side of the arch. Some of the existing 160 residences are relatively new homes that have been built within the last twenty years. Although these existing residences are no more than two stories in height and can be serviced

ment—if they were to pass that underpass or a structure where you knew they had limited clearance, somewhere from 0 to 9 inches, would the driver stop and have them walk them through it or just navigate it themselves?

"[The Fire Marshal]: I would think a good driver will look at the sign on the side of the road and stop and go through it closely, and have his passenger look out the side or just go down the center. Sometimes the signs are so close that somebody not familiar with the town who hasn't brought a truck through that area is going to be careful with a truck that's worth $800,000.

"[The Commissioner]: Could they come to a complete stop, chief?

"[The Fire Marshal]: I can't speak for Trumbull, but in Stratford it's probably drive up to it, look out the side, and drive through it really slow.

"[The Commissioner]: This is with a clear road. If we have a snowstorm that clearance is very close. If we have a snow, I was up there yesterday. It's tight. What do you do in a snowstorm?

"[The Fire Marshal]: It very well could be. Again, that would be something that the driver is going to have to assess when they get up to that area. Even with rain conditions, they're going to take it slow. And again, if it's a mutual aid [fire truck], they have to be careful and go down the center or get out and guide the truck."

by nonaerial fire trucks with ground ladders, the bottom of the highest window in the proposed development is thirty-one feet above grade. At the public hearing on June 10, 2008, the fire marshal stated that ground ladders can reach a height of thirty-five feet.

Moreover, the commission's denial assumes that aerial fire truck response would be required in the event of any emergency response. As stated by the fire marshal, an incoming call for assistance would be assessed by the fire department to determine the appropriate level of response. Not every call would require the dispatching of the town's aerial fire truck or necessitate mutual aid involving multiple aerial fire trucks.[19] As noted, all of the buildings in the proposed development have sprinklers, including sprinklers throughout the attics and decks. Every smoke detector is hardwired to a central reporting station. Accordingly, it cannot be assumed, given the proposed safety features, that every emergency call will require multiple aerial fire trucks on-site for fire suppression.

Furthermore, even if multiple aerial fire trucks are needed at the site, all of those trucks can fit under the Merritt Parkway underpass. Some can pass in the travel lanes with significant clearance. Others, however, will need to travel in the center of the road for the length of the underpass. The commission concluded, and the trial court agreed, that driving on the centerline of

---

[19] At the public hearing on June 10, 2008, the following colloquy occurred between one of the commissioners and the fire marshal:

"[The Commissioner]: How do you make the assessment to call mutual aid? If you got a phone call that said there was a fire at AvalonBay in Stratford, would you assume the worst and/or wait to assess the situation?

"[The Fire Marshal]: Normally depending on the calls coming into central dispatch, we can assess what is needed. Incidents can escalate very quick, or they can deescalate as soon as we get there. The chief on duty that would probably be first responding into that scene would make it. . . . Depending on the scene itself, calls coming into the dispatch, everything evolves pretty quick."

Cutspring Road would be a hazard because there would be a greater likelihood of a collision with oncoming traffic. There is no evidence in the record to support that conclusion. The evidence that was presented, by the plaintiff's fire safety consultant, was that a prudent fire truck driver would travel in the middle of the roadway under the underpass, regardless of the truck's height, because this route provides the most clearance and would take the least amount of time. Drivers of other vehicles on the roadway, after hearing the horn and siren and being alerted by the flashing lights of a fire truck, are obligated by statute to pull off to the side of the road to permit emergency vehicles to pass them.[20] There is no more of a hazard involved in driving down the centerline to the proposed development than there would be in driving down the center of any road in response to any emergency call.[21]

With respect to the issue of response time, the commission claims that the fire marshal's comments indicated that the response time would be impacted adversely because the height of the arch would require an aerial fire truck driver to proceed slowly through the underpass. See footnote 18 of this opinion. Those

---

[20] General Statutes § 14-283 (e) provides: "Upon the immediate approach of an emergency vehicle making use of such an audible warning signal device and such visible flashing or revolving lights or of any state or local police vehicle properly and lawfully making use of an audible warning signal device only, the operator of every other vehicle in the immediate vicinity shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection and shall stop and remain in such position until the emergency vehicle has passed, except when otherwise directed by a state or local police officer or a firefighter."

[21] The court's statement that "[e]ven without oncoming traffic, the risk of misjudging the clearance and colliding with the top of the archway is still present" finds no support in the record. The fire marshal, in fact, stated that such a collision would not occur: "It's [a fire truck traveling under the archway] not going to strike the underpass." There was no evidence to contradict that statement.

remarks, however, standing alone, do not provide suffi-
cient evidence to conclude that access via the under-
pass is inadequate. The length of the travel path under
the archway is ninety feet. Shortly after the fire truck
exits the underpass, it would reach the entrance to the
proposed development.[22] An emergency vehicle
approaching the site necessarily would have to slow
down to make that turn anyway, regardless of the height
of the vehicle. The record contains no evidence as to the
delay in response time that would result from slowing a
vehicle traveling through the underpass. The fire mar-
shal did not offer any opinion as to the actual distance
involved in slowing down or the amount of time lost that
would affect response time. The record must establish
more than a mere possibility of harm to a substantial
public interest. *River Bend Associates, Inc.* v. *Zoning
Commission*, supra, 271 Conn. 26. "The record must
contain evidence as to a quantifiable probability that a
specific harm will result if the application is granted.
. . . Mere concerns alone do not amount to sufficient
evidence to support the denial of an affordable housing
application pursuant to § 8-30g (g)." (Citations omit-
ted.) *AvalonBay Communities, Inc.* v. *Planning & Zon-
ing Commission*, 103 Conn. App. 842, 853–54, 930 A.2d
793 (2007).

The commission also claims that the evidence was
sufficient to establish that the underpass would require
repairs in the future, which would necessitate the clos-
ing of half of the travel lane, thereby precluding ladder
truck access to the site.[23] That evidence consisted of
remarks by counsel for the town at the public hearing

---

[22] At oral argument before this court, counsel for the commission conceded
that the turn to the proposed development is shortly after the end of the
archway.

[23] The trial court did not comment as to whether the evidence was suffi-
cient with respect to the repair claim.

on June 10, 2008, as he was questioning the plaintiff's safety consultant. Counsel for the town asked such questions as: "Are you aware there are cracks on the underpass?" and, "Are you aware that the cracks are more than six inches wide?" Counsel concluded with the statements: "Cracks require repair?" and, "To repair cracks you would use scaffolding, correct?"

There was no expert testimony, however, that those cracks compromised the safety of the underpass, that repairs would be needed or that any particular repair method would be used if they needed repair. In fact, the only evidence as to the department of transportation's plans with respect to the underpass was contained in a letter from the president of a firm of traffic engineers and transportation planners to the plaintiff's safety consultant dated January 17, 2001. That letter indicated that the firm had contacted the bridge operations division at the department of transportation and was told that the bridge had last been inspected in 1999, that it was in good shape, that there were no repairs contemplated and that the underpass would not be obstructed in any way by construction equipment should repairs be needed in the future.

From our review of the record, we conclude that the commission rested on speculation to support its safety concerns, and the record does not contain "evidence as to a quantifiable probability that a specific harm will result if the application is granted." *AvalonBay Communities, Inc.* v. *Planning & Zoning Commission*, supra, 103 Conn. App. 853–54. Accordingly, the trial court improperly determined that there was sufficient evidence in the record to support the commission's denial of the plaintiff's affordable housing application on the basis of safety concerns associated with emergency vehicle response to the proposed development via the Merritt Parkway underpass.

## II

## DEFENDANTS' CROSS APPEALS

In their cross appeals, the commission claims that the trial court exceeded the scope of the 2004 remand order in Judge Bryant's decision by assessing the adequacy of Circle Drive as a secondary access road for emergency vehicles, and the commission and the town claim that the trial court failed to analyze the evidence pertaining to the new wetlands impacts of the plaintiff's 2008 site plan. We disagree.

## A

## Circle Drive

The commission argues that Judge Bryant concluded that there was sufficient evidence in the record to establish that Circle Drive was inadequate to accommodate emergency vehicles and that her remand was limited to a determination as to whether reasonable changes could be made to the proposal to address that problem. Because Circle Drive cannot be widened, the commission argues that no reasonable changes can be made and that the court should have upheld the commission's denial of the affordable housing application on that stated ground.

Additional facts about Circle Drive are necessary for the resolution of the commission's claim. Circle Drive, an adjacent public street, provides a secondary emergency access to the proposed development. The paved surface is sixteen feet at its narrowest width. According to a memo from the town engineer, Circle Drive is approximately eighteen feet wide near the Cutspring Road intersection and approximately twenty-three feet wide at the bridge at Cook's Pond. In addition to the paved surface, there also is a well traveled strip along either side of constricted portions of Circle Drive. There are twenty-nine residences on Circle Drive, and several

of those properties are nonconforming as to lot area or lot depth. Widening Circle Drive in front of those properties would render the lots more nonconforming.

In its written denial of the plaintiff's affordable housing application, the commission noted that the 2008 site plan did not include any proposed change to Circle Drive. It also noted that any expansion of that road would make certain nonconforming properties on Circle Drive even more nonconforming. The commission then discussed the width of the road and the width of ladder trucks and concluded that "maneuvering a ladder truck down that drive is very difficult" if vehicles are parked on both sides of Circle Drive. It stated that "[a]ny car breakdown or accident along Circle Drive would eliminate its use entirely for emergency access purposes." For those reasons, the commission concluded: (1) "Circle Drive remains unusable as a means of emergency access," (2) its inadequate roadway width cannot accommodate two-way traffic on a consistent basis, (3) response time is adversely affected and (4) it is not possible to expand Circle Drive. Accordingly, the commission stated that it was unable to suggest any reasonable accommodation to address that identified public safety concern.

The trial court, after discussing the arguments presented by the plaintiff and the commission with respect to the adequacy of the secondary emergency access provided by Circle Drive, agreed with the plaintiff that Circle Drive was "neither too narrow as to be impassable, nor so constricted as to delay response time to a degree that would render the road unusable as an emergency access route." The commission challenges that determination, claiming that the trial court exceeded the scope of Judge Bryant's remand order. According to the commission, the order required it to consider whether reasonable changes could be made to the proposed development to eliminate or satisfactorily

reduce the safety concerns about Circle Drive. After the commission determined that the plaintiff had proposed no changes to Circle Drive and that no reasonable accommodation could be made in connection with the secondary emergency access route, the commission claims that the trial court was required to uphold the commission's decision because the commission had demonstrated that no reasonable changes to the plan could be made to alleviate the emergency access dangers posed by Circle Drive. Thus, the commission claims, the trial court improperly reexamined the issue of the adequacy of the access that already had been determined by Judge Bryant.

The commission's trial brief did not fairly alert the trial court to this claim. The commission did not argue that the court was restricted in connection with its analysis of the Circle Drive issue. In fact, in its memorandum of decision, the court made several references to evidence in the record that the commission claimed was sufficient to demonstrate the inadequacy of Circle Drive as a secondary access route. Further, the court's decision did not even address the claim of the commission that the court's review was limited by the remand order. The court discussed the commission's arguments that the road was too narrow for adequate passage of emergency vehicles, that the narrowness would cause a delay in response time and that the zoning regulations prevented the widening of Circle Drive. The trial court was not apprised and obviously did not believe the scope of the remand order was at issue, as now claimed by the commission, and we, therefore, decline to address that claim.[24]

---

[24] "It is well settled that a trial court can be expected to rule only on those matters that are put before it." *State* v. *Jose G.*, 290 Conn. 331, 346, 963 A.2d 42 (2009). The commission did not present to the trial court the theory that it now argues on appeal. "[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . ." (Citation omitted; internal quotation marks omitted.) *Ingels* v. *Saldana*, 103 Conn. App. 724, 730, 930 A.2d 774 (2007). "For this court to . . . consider

Turning to the parties' arguments addressing the adequacy of Circle Drive and the commission's denial on the stated ground that it was too narrow to provide secondary emergency vehicle access to the proposed development, we conclude that the record provides support for the trial court's determination that the commission's denial of the affordable housing application on that stated ground was improper. As correctly noted by the court, the commission's determination that the sixteen foot wide portion of Circle Drive renders that roadway impassable for emergency vehicles is unconvincing for several reasons. First, in order for the argument to have merit, three chance occurrences must manifest simultaneously: (1) there is a fire at the development, (2) the primary access road is blocked at the time of that fire, and (3) a vehicle is parked at the most constricted portion of Circle Drive on the day of the fire when the primary access road is blocked.[25]

[a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." (Internal quotation marks omitted.) *Gilbert* v. *Beaver Dam Assn. of Stratford, Inc.*, 85 Conn. App. 663, 680, 858 A.2d 860 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

Furthermore, we note that the plaintiff appealed from Judge Bryant's 2004 decision and Judge Cohn's 2009 judgment. See footnote 11 of this opinion. Our scope of review of the commission's decision, which is based solely on the record, is the same as the trial court's scope of review. See footnote 12 of this opinion; *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 726 n.29. We, therefore, can determine whether the commission's decision was supported by sufficient evidence in the record with respect to the adequacy of Circle Drive as a secondary emergency access route, whether the decision was necessary to protect substantial interests in safety, whether the risk of harm to public interests clearly outweighed the need for affordable housing and whether the public interest could be protected by reasonable changes to the proposed development. See *River Bend Associates, Inc.* v. *Zoning Commission*, supra, 271 Conn. 26. Even if Judge Cohn was limited by the remand order, as argued by the commission, our review is not limited.

[25] As noted by the court, the record reveals that Circle Drive is wider in other areas, measuring eighteen, twenty and twenty-three feet at various locations. Further, there is a traveled strip along the paved portion of the roadway.

As further noted by the court, it is important to focus on the fact that Circle Drive provides a secondary emergency access to the proposed development. Circle Drive would be used only in the event that the emergency response vehicles could not access the development by the primary route. Moreover, firefighters, who, the court agreed, are "the most resourceful people on the planet," could maneuver their trucks onto the unpaved, well traveled strip of land along the road if it became necessary. Additionally, in response to the expressed concern that snow would impact emergency vehicle access, the court stated that the evidence in the record established that the average fire department response to Circle Drive in the winter months was 7.1 minutes whereas the average fire department response during the summer months was 7.0 minutes. The court's final reason for its conclusion, which we find to be particularly significant, is that "[i]t stands to reason that if the [town's] fire department can access the [twenty-nine] homes currently on Circle Drive in a timely fashion, it can also expediently access the development."

We, therefore, conclude that the trial court properly determined that the commission's concerns about Circle Drive as an adequate secondary emergency route did not provide a sufficient basis for the denial of the plaintiff's affordable housing application.

B

Environmental Concerns

The commission and the town claim that the trial court failed to analyze the evidence pertaining to new impacts to the wetlands that would result from the implementation of the plaintiff's 2008 site plan. They argue that the wetlands impacts changed materially in the 2008 plan reviewed by the court and that the court did not perform an independent analysis of the evidence

in the record with respect to those negative impacts. We disagree.

The following additional facts and procedural history are necessary for the resolution of the defendants' claims. In May, 2001, the plaintiff filed a revised application for a wetlands permit with the town's wetlands agency. See footnote 2 of this opinion. The wetlands agency denied the application, and the plaintiff filed an appeal with the Superior Court. The trial court, *Shortall, J.*, reversed the decision of the wetlands agency, and the wetlands agency filed a certified appeal with this court. In 2004, while that appeal was pending, the plaintiff filed another application for a wetlands permit with the wetlands agency for the proposed development. That application was denied, and the plaintiff appealed to the Superior Court. In November, 2008, the plaintiff withdrew that administrative appeal.

The plaintiff's appeal from the commission's denial of its 2001 affordable housing application was decided by Judge Bryant in 2005. One of the stated grounds for the commission's denial was the perceived negative impacts on the wetlands. Judge Bryant concluded that the commission failed to prove that the denial was necessary to protect the public interest. Subsequent to her decision, Judge Shortall reversed the decision of the wetlands agency that denied the plaintiff's application for a wetlands permit, concluding that the proffered reasons for the denial did not rise above speculation or general concerns and were not supported by substantial evidence in the record. Our decision in the wetlands agency's appeal from that judgment was released on the same date as this opinion, and we affirmed the trial court's judgment.

When the plaintiff filed the 2008 site plan with the commission in the present case, it did not file a new application for a wetlands permit with the wetlands

agency. The plaintiff claimed that it was not required to do so because the 2001 and 2008 site plans did not differ with respect to regulated wetland activity and stormwater management. At the time the plaintiff submitted its 2008 site plan to the commission, it filed a report prepared by its professional engineer, which included these supporting calculations, stating that the 2008 plan made no change to the 2001 plan with respect to the wetlands or the brook.

At the public hearing on May 13, 2008, counsel for the town requested that the commission refer the plaintiff's 2008 site plan to the wetlands agency for its determination of its impacts on the wetlands. Counsel for the plaintiff objected to any such referral. By memorandum to the chairman of the wetlands agency dated May 19, 2008, the commission requested the wetlands agency to determine whether the 2008 site plan was more similar to the 2001 or the 2004 wetlands activity plan. The commission received a memorandum from the wetlands agency on July 8, 2008, in which it expressed its opinion that the 2008 site plan was "closer in design and detail to the 2004 [wetlands] plan than to the 2001 [wetlands] plan." The wetlands agency then proceeded to discuss the similarities between the 2004 and the 2008 plans and concluded that there did not appear to be any significant difference in wetland impacts between the 2004 and the 2008 plans.

In its written denial of the plaintiff's 2008 site plan application, the commission relied on the memorandum of the wetlands agency and regarded the 2004 report of the wetlands agency, in which it had denied the plaintiff's application for a wetlands permit, as the operative report to be considered pursuant to § 8-3 (g). On the basis of that report, the commission concluded that the proposed development would result in the destruction of a pocket wetlands on adjacent property[26] and

---

[26] The area referred to as the pocket wetlands by the parties and the court, which was located off-site on the property of 152 Circle Drive, which is

increased sedimentation and erosion into Pumpkin Ground Brook and its wetlands. The commission further concluded that those negative impacts outweighed the need for affordable housing within the meaning of § 8-30g (g). Finally, with respect to the claims of the town as an environmental intervenor, the commission concluded that the aforementioned impacts were "reasonably likely to have the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state" and that there were reasonable and prudent alternatives that would protect those resources.

Less than one month after the commission denied the plaintiff's 2008 site plan application, the wetlands agency filed a motion to dismiss its own appeal from Judge Shortall's decision, then pending in the Supreme Court, on the ground of mootness. In its motion, the wetlands agency claimed that the plaintiff's 2008 site plan application was so dissimilar from the 2001 wetlands plan reviewed by Judge Shortall that there could be no practical relief granted on appeal. The plaintiff objected to the motion to dismiss, arguing that the regulated activity as depicted in its 2001 wetlands plan was the same activity as depicted on its 2008 site plan because there had been no change in impact to the offsite pocket wetlands or stormwater management. The Supreme Court denied the motion to dismiss filed by the wetlands agency on October 20, 2008.

With that background, the trial court in the present case issued its memorandum of decision on August 13, 2009, and concluded that the commission's environmental concerns did not provide a sufficient basis for the denial of the plaintiff's affordable housing application. In its decision, the court made the following determinations: (1) upon the court's independent comparison of

adjacent to the proposed secondary emergency access at 140 Circle Drive, consisted of a man-made berm and drainage ditch measuring 360 square feet.

the wetlands activity depicted in the 2001 wetlands plan and the 2008 site plan, it was unable to conclude that the 2008 site plan differed so greatly from the 2001 wetlands plan that a new assessment of wetlands activity was required in order to comply with § 8-3 (g); (2) there was not enough evidence in the record to suggest that the plans differed to such a degree that the plaintiff was required to submit a new application to the wetlands agency; (3) its conclusion with respect to this issue was in accord with the Supreme Court's denial of the wetlands agency's motion to dismiss its appeal from Judge Shortall's decision; and (4) even if the commission and town could establish unequivocally that there would be an adverse impact to the environment, the evidence in the record was insufficient to demonstrate that the wetlands concerns outweighed the need for affordable housing. We agree.

As previously noted, we have affirmed Judge Shortall's decision that concluded that the wetlands agency improperly denied the plaintiff's 2001 application for a wetlands permit. Many of the wetlands concerns that were raised by the town at the public hearing on the plaintiff's 2008 site plan application were identical to the concerns raised in connection with the plaintiff's 2001 wetlands application. Those claims now have been addressed.

With respect to the claims of the town and the commission that the 2008 site plan presented new wetlands concerns, we agree with the trial court that the record is insufficient to support such a conclusion. The 2008 proposed development has fewer units, has moved two buildings and a detention basin further away from wetlands boundaries, has reduced the amount of impervious coverage and has reduced the amount of earth excavation and filling. The plaintiff's experts presented evidence, orally and in written reports with calculations, to show that there are no new adverse impacts

to the wetlands. Although two of the town's witnesses stated that they disagreed with those conclusions, they admitted that they had not performed their own calculations when questioned by the plaintiff's counsel at the public hearing.[27]

Finally, and most significantly, we agree from our own review of the record that it was not established that any of the perceived concerns regarding environmental issues outweighed the need for affordable housing in the town. For that reason alone, the trial court properly concluded that the commission's denial of the plaintiff's affordable housing application was not supported by the record.

On the plaintiff's appeal, the judgment is reversed and the case is remanded to the trial court with direction to render judgment sustaining the plaintiff's appeal and directing the commission to approve the plaintiff's affordable housing site plan application. On the defendants' cross appeals, the judgment is affirmed.

In this opinion the other judges concurred.

---

[27] We note that the Supreme Court denied the motion to dismiss the wetlands appeal from Judge Shortall's decision, as indicated by the trial court in the present case. The Supreme Court summarily denied the motion, without a written decision. It is not within the province of this court to second-guess decisions of our Supreme Court. "[W]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions." (Internal quotation marks omitted.) *Mazzuca* v. *Sullivan*, 94

Conn. App. 97, 102, 891 A.2d 83, cert. denied, 278 Conn. 905, 896 A.2d 107 (2006).