******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BRENMOR PROPERTIES, LLC *v.* PLANNING AND
ZONING COMMISSION OF THE
TOWN OF LISBON
(AC 37293)

Gruendel, Mullins and Sullivan, Js.

*Argued October 13, 2015—officially released February 2, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Land Use Litigation Docket, Shluger, J.)

*Michael A. Zizka*, for the appellant (defendant).

*Timothy S. Hollister*, with whom was *Andrea L.
Gomes*, for the appellee (plaintiff).

*Opinion*

GRUENDEL, J. The defendant, the Planning and Zoning Commission of the Town of Lisbon (commission), appeals from the judgment of the Superior Court sustaining the administrative appeal of the plaintiff, Brenmor Properties, LLC. The commission contends that the court improperly concluded that the plaintiff's failures to comply with (1) the road construction standards established by town ordinance and (2) the Connecticut State Fire Prevention Code (fire code) were not valid grounds to deny its application for an affordable housing subdivision. The commission also challenges the propriety of the remand ordered by the court. We affirm the judgment of the Superior Court.[1]

The underlying facts are not in dispute. At all relevant times, the plaintiff owned a 12.92 acre parcel of undeveloped land with frontage on Ames Road and Route 169 in Lisbon (property). The property contains a small pond and 1.9 acres of the property are designated as wetlands.[2] In May, 2012, the plaintiff filed an application with the commission pursuant to General Statutes § 8-30g for approval of an affordable housing subdivision.[3] The proposed subdivision consisted of nineteen residential lots with an average size of 29,620 square feet. On all but one lot, a single-family, three bedroom modular home[4] would be erected.[5] The proposal also included a dedicated septic system and well for each home. With respect to price restrictions, six of the eighteen proposed homes "would be deed-restricted for forty years at prices within the economic reach of moderate income households, such that, based on 2012 data, three homes would be preserved for households earning $70,200 or less and sold at a maximum of $247,000; and three homes would be preserved for households earning $52,600 or less and sold at a maximum of $174,000. Other homes would be sold at market-rate prices in the range of $275,000."[6]

Four of the proposed lots were to be located on the westerly side of the property and would be accessed by driveways on Route 169. The remaining lots were to be located on the easterly side of the property adjacent to Ames Road and would be accessed by a private roadway, which the plaintiff describes as a "common driveway"[7] and the commission characterizes as an "interior road network."[8] This appeal concerns that roadway.[9]

The commission conducted a public hearing on the plaintiff's original application that began on August 7, 2012, and was continued over four additional evenings on September 4, October 2, November 7, and November 13, 2012. In response to various comments raised during that hearing, the plaintiff submitted multiple revisions to its proposal, culminating with its November 13, 2012 "final submission materials." Following the conclusion

of the public hearing, the commission's legal counsel, Attorney Michael Zizka, prepared a document dated January 8, 2013, and entitled "Brenmor Subdivision Application Issues and Potential Conditions of Approval" (document). That document delineated seven issues and provided analysis thereof. At the commission's regular meeting on January 8, 2013, the commission reviewed those seven issues. The proposed roadway's nonconformance with the Lisbon road ordinance (road ordinance)[10] generated the most discussion, as the roadway violated its minimum width and maximum grade requirements.[11] On that issue, Commissioners Robert Adams, Ronald Giroux, Kim Sperry, John Dempsey, Gary Ritacco, Sharon Gabiga and David Gagnon all concurred that the proposed roadway needed to comply with the road ordinance as a matter of public safety.[12] When the deliberations concluded, Zizka stated that, in light of the sentiments expressed by commission members, his "recommendation would be that the commission deny the application for the reasons set forth in the [document] regarding issues numbered 1, 2, 4 . . . ." Commissioner Giroux then immediately made such a motion, stating: "I'd like to make a motion to deny the application to the issues of 1, 2, 4 . . . ."[13] The motion was approved by a vote of eight to zero, with one commissioner abstaining. Following that vote, Zizka remarked for the record that "as [he] understood it, [the commission is] prepared to entertain and . . . perhaps even welcome the [plaintiff] to come back with . . . a renewed proposal where the road meets town standards because . . . the belief is that that would solve most of . . . the issues that the commission has the greatest concerns with."

On January 30, 2013, the plaintiff filed with the commission a modified affordable housing proposal pursuant to § 8-30g (h).[14] Consistent with the strictures of that statutory mechanism, the plaintiff emphasized that "this resubmission constitutes a continuation of the application denied January 8; this is not a new application." The revised plan contained certain modifications that the plaintiff made "in direct response to the [commission's] January 8, 2013 denial."[15] That revised plan nonetheless did not modify the width or grade of the proposed roadway adjacent to Ames Road so as to fully comply with the requirements of the road ordinance. In its written response to the commission's January 8, 2013 denial of its subdivision application, the plaintiff acknowledged that the commission at that time had proposed, as a potential condition of approval, that the roadway "shall conform to standards established" in the road ordinance. The plaintiff nonetheless submitted that such a condition was unnecessary, as "[t]here is no expert or other testimony in the record that the proposed [roadway is] unsafe." The plaintiff thereafter further revised its proposal, as reflected in its revised plan that was received by the commission on March

5, 2013.

On March 5, 2013, the commission held a public hearing on the plaintiff's modified application, as required by § 8-30g (h). At its outset, the plaintiff's representative, Attorney Timothy Hollister, provided an overview of the changes to its proposal. On the issue of compliance with the road ordinance, Hollister candidly acknowledged that "[w]e just don't think it's necessary to build these internal private roads including the town standard in terms of widths and sidewalks and turn arounds and so forth. It's just not—these don't serve enough lots that that's required to do." Hollister concluded his prefatory remarks by stating that "where we end up is really, I think . . . one big issue . . . and that is . . . whether this internal, what we call the private internal roadway system, driveway is safe for the people who want to live there . . . ."

Mark Vertucci, a traffic engineer retained by the plaintiff, then addressed the commission. Vertucci prepared a traffic impact study that was submitted with the plaintiff's original application. That study utilized traffic rates provided by the Institute of Transportation Engineers Trip Generation Manual, an "industry accepted resource." Vertucci's analysis concluded that the proposed subdivision was "going to be a very low traffic generator, given the . . . small number of units." Vertucci further concluded that "the development will provide safe and efficient access, egress, and circulation for the residents and guests of the subdivision as well as the general public entering or passing the property. In addition, the [proposed roadway] interior to the site will sufficiently accommodate circulation by emergency vehicles." As part of the plaintiff's modified application, Vertucci provided both a written "traffic safety review" and testimony before the commission, in which he opined that the plan set forth in the resubmission "does provide for safe traffic operations and site circulation. It provides for safe ingress and egress for passenger cars and emergency vehicles [and] does not present any public health or safety concerns."

At that public hearing, the commission's professional staff also commented on the modified proposal. James Rabbitt, the town planner, and Robert DeLuca, the town engineer, disagreed with the plaintiff's assertion that the proposed roadway qualified as a driveway, as it would provide "the only access to fifteen single-family dwellings." Rabbitt and DeLuca both noted that the proposed roadway did not comply with the minimum width or maximum grade requirements of the road ordinance. In his March 1, 2013 letter to Rabbitt, DeLuca had opined that the standards set forth in the road ordinance "provide for an appropriate higher level of safety" and reflected "a typical policy within [Connecticut] municipalities for access roads to multiple residences as opposed to a shared driveway to 2–3

residences." At the public hearing, DeLuca stated, "I do feel that the infrastructure needs to be built completely to service all these lots safely . . . so that it'll be in place so that emergency vehicles can safely get around regardless of how many houses they have built."[16] Although they repeatedly emphasized that the proposed roadway did not comply with the requirements of the road ordinance, neither Rabbitt nor DeLuca indicated that compliance was necessary to protect a substantial public interest or that the risk of harm thereto clearly outweighed the need for affordable housing.

The commission deliberated the merits of the plaintiff's application at its April 2, 2013 meeting. During those deliberations, commission members debated whether to defer their final vote, as Zizka was not present at that time but was available to attend a special meeting the following week. After one unidentified commissioner indicated his unavailability the following week, another stated: "There's gonna be quite a lot of information here between the three reports [submitted by Zizka, DeLuca and Rabbitt]. It's kind of tough to make a decision just reading them now." When Chairman Adams inquired as to whether his colleagues had "enough information to vote tonight," an unidentified commissioner responded: "I feel that we have enough information to vote tonight. This has been going on for quite a while. We did get all this information. It has been basically the same information over and over and over. [The plaintiff] made a couple changes last month, ah. Their attorney basically said to us last month you can vote tonight because, you know, you know we're gonna go to court. They're gonna deny it. So vote tonight and get it over with. And, that's it. And, ah, you know we're going over the same stuff tonight we went over last month and it's just saying how much stuff you gonna read on the same subject? You know. It's the same thing over and over and over."

Shortly thereafter, Chairman Adams then asked, "[a]ny further discussion?" Hearing no reply, he continued: "Okay. All in favor of having a motion tonight. Vote tonight. Who would like to make a motion? And, and be forewarned. When you make a motion, you have to be pretty specific. You can't just say testimony or other information given by the planner and other staff. You have to be clear. As many of you know, that [the plaintiff is] already expecting us, expecting this [commission] to go to court so you have to be pretty specific and careful on what you're making a motion and how you're presenting it and the reasons you're for your motion." At that point, Commissioner Sperry made "a motion to deny the resubmitted application based on the testimony from the town engineer, fire marshal, and town [attorney]. The road does not meet code, doesn't meet fire code, doesn't meet town code. Um. Based upon the retraction of the commitment to build the

entire infrastructure and we're back to a piecemeal infrastructure as we go. Um, ah, and, um the elimination of, ah, the, ah, the right of way, um, that can potentially, ah, put the wells at risk and does not allow the town the flexibility it needs to, um, maintain or widen or do work, now or in the future, on Ames Road as well as I believe Lot 17 is still on the plan and that is not an approved lot." Chairman Adams then inquired, "[a]m I to take that motion to mean, in addition to the other, ah, information on the record?" Commissioner Sperry replied, "in addition to the information on the record, the testimony submitted by [inaudible] engineers, that [of] the town of Lisbon fire marshal, [and Zizka and Rabbitt]." That motion to deny was approved by a vote of eight to zero, with one commissioner abstaining.

From that decision, the plaintiff appealed to the Superior Court. On June 13, 2014, the court issued its memorandum of decision. In sustaining the plaintiff's appeal, the court concluded that neither noncompliance with the road ordinance nor noncompliance with the fire code constituted a valid ground on which to deny the plaintiff's application.[17] As a result, the court reversed the "denial of the plaintiff's resubmission and remand[ed] the case to the [commission] with direction to grant the plaintiff's resubmission as is." The commission thereafter filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o). We granted the commission's petition and this appeal followed.

I

As a preliminary matter, we first consider the plaintiff's claim, raised as an alternative ground of affirmance, that the commission failed to state its reasons for denying the resubmitted application when it rendered its decision. Section 8-30g obligates a land use agency "to make a collective statement of its reasons on the record when it denies an affordable housing land use application." *JPI Partners*, *LLC* v. *Planning & Zoning Board*, 259 Conn. 675, 692, 791 A.2d 552 (2002). That requirement serves to provide "a clear basis" for a court to review that decision; (internal quotation marks omitted) id., 689; as opposed to "reasons that later might be culled from the record . . . ." (Internal quotation marks omitted.) Id. "Requiring the [land use agency] to state its reasons on the record when it denies an affordable housing land use application will further that purpose because it will help guard against possibly pretextual denials of such applications." (Internal quotation marks omitted.) Id., 689–90.

At the same time, our Supreme Court has cautioned against exalting "form over substance" in contemplating the adequacy of such decisions. *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 730, 780 A.2d 1 (2001). Rather, "we must recognize that the commission is composed of laymen whose procedural expertise may not always comply with the

multitudinous statutory mandates under which they operate. . . . We must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for *technical infirmities* in their actions . . . ."[18] (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 730–31. Affording a degree of latitude is particularly appropriate in the context of affordable housing appeals, where—unlike traditional zoning appeals—the reviewing court is not empowered to scour the record in search of a proper basis for the agency's decision. *Christian Activities Council, Congregational* v. *Town Council*, 249 Conn. 566, 575–76, 735 A.2d 231 (1999) (outlining differences between affordable housing appeal and traditional zoning appeal); cf. *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 673, 111 A.3d 473 (2015) (in traditional zoning appeal, when zoning agency fails to provide collective statement for its actions, reviewing court obligated to search entire record to find basis for agency's decision).

Admittedly, the motion to deny the plaintiff's modified application was not a model of precision. It nonetheless set forth various grounds for denial in plain fashion. In particular, the motion stated that the proposed roadway did not comply with the town code or the fire code. In that respect, the motion echoed the commission's January 8, 2013 denial of the plaintiff's original application, in which the formal motion incorporated by reference the document detailing the commission's concerns regarding noncompliance with both the road ordinance and the fire code. As a result, we conclude that the record contains a clear basis on which to review the commission's decision.[19] We therefore turn our attention to the distinct claims raised by the commission in this appeal.

II

The commission's principal claim is that the court improperly concluded that the plaintiff's noncompliance with the road ordinance did not constitute a valid ground on which to deny its affordable housing application. The commission maintains that because the road ordinance is a municipal legislative enactment aimed at protecting public health and safety, "any deviation from the ordinance's standards should be deemed unacceptable per se."

The parameters of our review of an affordable housing appeal are circumscribed by § 8-30g (g).[20] Section 8-30g (g) provides: "Upon an appeal taken under subsection (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission, that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. The commission shall also have the burden to prove, based upon the evidence in the record

compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in health, safety or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development, or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses; and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it."

The standard of review embodied in § 8-30g (g) is twofold in nature. See *JPI Partners, LLC* v. *Planning & Zoning Board*, supra, 259 Conn. 690. First, a reviewing court must "determine whether the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. . . . Specifically, the court must determine whether the record establishes that there is more than a mere theoretical possibility, but not necessarily a likelihood, of a specific harm to the public interest if the application is granted." (Citation omitted; internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Zoning Commission*, 271 Conn. 1, 26, 856 A.2d 973 (2004). If that standard is met, the reviewing court then "must conduct a plenary review of the record and determine . . . whether the commission's decision was necessary to protect substantial interests in health, safety or other matters that the commission legally may consider, whether the risk of such harm to such public interests clearly outweighs the need for affordable housing, and whether the public interest can be protected by reasonable changes to the affordable housing development." Id. That plenary review entails an independent review of the land use agency's decision "based upon [the reviewing court's] own scrupulous examination of the record."[21] *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 727.

A

We therefore begin with the question of whether the commission's decision to deny the modified application due to the plaintiff's noncompliance with the road ordinance is supported by sufficient evidence in the record. Our Supreme Court has "defined sufficient evidence in this context to mean less than a preponderance of the evidence, but more than a mere possibility. . . . [T]he zoning commission need not establish that the effects it sought to avoid by denying the application are definite

or more likely than not to occur, but that such evidence must establish more than a mere possibility of such occurrence." (Internal quotation marks omitted.) *Christian Activities Council, Congregational* v. *Town Council*, supra, 249 Conn. 585. Notably, that court also has indicated that the sufficient evidence standard imposes a "lesser burden" than the substantial evidence standard. *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 149–50, 653 A.2d 798 (1995).

The substantial evidence standard has been described as one that "is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, 247 Conn. 95, 118, 717 A.2d 1276 (1998); accord *Dickinson* v. *Zurko*, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (clearly erroneous standard stricter than substantial evidence standard); *Brunswick* v. *Statewide Grievance Committee*, 103 Conn. App. 601, 612, 931 A.2d 319 ("[t]he substantial evidence standard is even more deferential" than clearly erroneous standard), cert. denied, 284 Conn. 929, 934 A.2d 244 (2007). Because the sufficient evidence standard applicable to affordable housing appeals imposes a *lesser* burden than substantial evidence, that burden is minimal. A land use agency simply must establish that something "more than a mere theoretical possibility" of harm to the public interest exists. *River Bend Associates, Inc.* v. *Zoning Commission*, supra, 271 Conn. 26.

As a municipal legislative enactment, the road ordinance is entitled to a presumption that it is predicated on a legitimate public policy. See *Pollio* v. *Planning Commission*, 232 Conn. 44, 49, 652 A.2d 1026 (1995) ("a presumption of validity is accorded to municipal ordinances"); see also *State* v. *Santiago*, 318 Conn. 1, 72 n.62, 122 A.3d 1 (presumption that legislative body acted for legitimate reasons), rehearing denied, 319 Conn. 912,     A.3d     (2015); *Tine* v. *Zoning Board of Appeals*, 308 Conn. 300, 306, 63 A.3d 910 (2013) (presumption that legislative bodies do not intend to enact meaningless provisions). The road ordinance at issue here expressly indicates that its purpose is to "protect the public health and safety." See footnote 10 of this opinion. In furtherance of that aim, the ordinance prescribes, inter alia, minimum widths and maximum grades for roads constructed in Lisbon. In light of the foregoing, the commission reasonably could conclude that noncompliance therewith creates more than a mere theoretical possibility of harm to public health and safety. We therefore agree with the commission that noncompliance with a municipal legislative enactment intended to protect the public health and safety constitutes evidence sufficient to satisfy the minimal threshold determination under § 8-30g (g).

B

We next consider whether the commission's decision to deny the plaintiff's application due to noncompliance with the road ordinance "was *necessary* to protect substantial interests in health, safety or other matters that the commission legally may consider [and] whether the risk of such harm to such public interests *clearly outweighs* the need for affordable housing  . . . ." (Emphasis added.) *River Bend Associates, Inc.* v. *Zoning Commission*, supra, 271 Conn. 26. On those questions, our review is plenary. Id., 22.

The commission claims that "any deviation" from the requirements set forth in the road ordinance entitles it to deny an affordable housing application. We disagree. As our case law recognizes, § 8-30g is a remedial statute. *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 140. A principal aim of § 8-30g is to prevent prextextual denials. See, e.g., *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 729; *Town Close Associates* v. *Planning & Zoning Commission*, 42 Conn. App. 94, 105, 679 A.2d 378, cert. denied, 239 Conn. 914, 682 A.2d 1014 (1996). That purpose easily would be thwarted were we to adopt the "per se" rule proposed by the commission regarding noncompliance with municipal legislative enactments. It is axiomatic that we must "construe a statute in a manner that will not thwart its intended purpose  . . . ." (Internal quotation marks omitted.) *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 686, 986 A.2d 290 (2010).

Furthermore, the commission's contention also is contrary to another purpose of that statute, which is to eliminate the traditional deference to such municipal legislative enactments. As our Supreme Court observed, "[b]ecause of the importance of developing affordable housing, the normally applicable presumption of regularity that applies to municipal enactments would not apply in Affordable Housing Appeals." (Internal quotation marks omitted.) *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 716, quoting Blue Ribbon Commission on Housing, Report and Recommendations to the Governor and General Assembly (February 1, 1989) p. A-9. Consistent with that purpose, our precedent instructs that noncompliance with a municipal legislative enactment alone does not furnish a proper basis for a land use agency to deny an affordable housing application. Rather, the agency also must determine whether, in light of the rationale underlying the municipal legislative enactment, compliance is necessary to protect a substantial public interest and whether the risk of harm to that interest clearly outweighs the need for affordable housing.

As this court has held, § 8-30g "does not allow a commission to use its traditional zoning regulations to justify a denial of an affordable housing application,

but rather forces the commission to satisfy the statutory burden of proof." *Wisniowski* v. *Planning Commission*, 37 Conn. App. 303, 317, 655 A.2d 1146, cert. denied, 233 Conn. 909, 658 A.2d 981 (1995). It is well established that a zoning regulation, like a road ordinance, is a municipal legislative enactment. See *Spero* v. *Zoning Board of Appeals*, 217 Conn. 435, 441, 586 A.2d 590 (1991); *Harlow* v. *Planning & Zoning Commission*, 194 Conn. 187, 193, 479 A.2d 808 (1984). "The zoning commission, in the enactment of zoning regulations [acts as] a municipal legislative body." *Lebanon* v. *Woods*, 153 Conn. 182, 190, 215 A.2d 112 (1965); see also *Dinan* v. *Board of Zoning Appeals*, 220 Conn. 61, 74, 595 A.2d 864 (1991) (describing zoning commission as "[t]he municipal legislative body empowered to adopt zoning regulations"); *Planning & Zoning Commission* v. *Gilbert*, 208 Conn. 696, 705, 546 A.2d 823 (1988) ("[p]romulgation of zoning regulations is a legislative process, although local in scope"); *Parks* v. *Planning & Zoning Commission*, 178 Conn. 657, 660, 425 A.2d 100 (1979) ("a local zoning [agency], in enacting or amending its regulations, acts in a *legislative* rather than an administrative capacity" [emphasis in original]). Accordingly, whether the issue is noncompliance with a municipal zoning regulation or noncompliance with a municipal road ordinance, the inquiry is the same. Thus, "[i]nstead of simply questioning whether the application complies with [the municipal legislative enactment at issue] . . . under § 8-30g, the commission considers the rationale behind the [enactment] to determine whether [compliance is] necessary to protect *substantial* public interests in health, safety or other matters. . . . The commission must look at the rationale behind [the enactment] to determine if there is a substantial interest, outweighing the need for affordable housing, that must be protected by the denial of an application." (Emphasis in original.) *Wisniowski* v. *Planning Commission*, supra, 317–18.

In sum, we agree with the commission that "the establishment of town-wide standards for road construction is matter of public health and safety that a commission may properly consider under the affordable housing appeals act." We disagree with the commission's contention that any deviation from those standards constitutes a "per se" ground for denial of an affordable housing application. As *Wisniowski* plainly indicates, the commission must further demonstrate, as part of its burden in an affordable housing appeal, that compliance with such standards is necessary to protect the public interest, that the risk of harm thereto clearly outweighs the need for affordable housing, and that the public interest cannot be protected by reasonable changes to the affordable housing development. See General Statutes § 8-30g (g) (1).

We conclude that the commission has not met that burden. As an initial matter, we note that the minimum

road width and maximum grade requirements set forth in §§ 4.3 and 4.4 of the road ordinance are not absolutes. To the contrary, § 2.2.3 of the road ordinance provides that "[t]he Board of Selectman may approve alternate design and construction standards when (a) such standards are prepared by a licensed professional engineer and (b) the board determines that such standards will be in accord with the purpose and intent of the road ordinance."[22] The road ordinance thus contemplates the construction of roads in Lisbon that depart from the standards specified therein.

Second, it is undisputed that the proposed roadway would remain a private road, rather than a public road, and would serve only fifteen homes. As part of its modified application, the plaintiff provided the commission with a "Homeowner's Agreement for Lots 1-15" that provides in relevant part that the proposed roadway "is a private driveway and [the] Town of Lisbon shall have no obligation for any costs associated with the maintenance, repair or replacement thereof or for resolving any disputes among [the] [p]arties relating to the use, maintenance, repair or replacement or costs associated with" the roadway. See also footnote 7 of this opinion. For that reason, the town planner remarked during the commission's deliberations on the modified proposal that "the road system is not proposed as public . . . ." The document prepared by the commission's legal counsel, which the commission incorporated by reference into its January 8, 2013 denial of the original application, likewise acknowledged that "the roads would be privately owned . . . ." The fact that the proposed roadway would not be a public road further informs our consideration of whether the rationale underlying the requirements of the road ordinance compels strict compliance in this case.[23]

Third, the record is replete with expert testimonial and documentary evidence from Vertucci, a senior transportation engineer with Fuss & O'Neill, Inc., who also is certified by the Institute of Transportation Engineers as a professional traffic operations engineer. In both his January 30, 2013 "traffic safety review" letter[24] and his testimony during the public hearing on the plaintiff's modified application, Vertucci provided his expert opinion that the plaintiff's modified proposal "does provide for safe traffic operations and site circulation. It provides for safe ingress and egress for passenger cars and emergency vehicles [and] does not present any public health or safety concerns." In particular, Vertucci noted that the proposed twenty foot width of the roadway was "adequate for two vehicles to pass each other at one time." He also emphasized that the modified plan included no parking zones and that "[e]ven if there were a vehicle parked along a driveway anywhere in the site, we'd still have the width for a fire truck to get by. Fire trucks are at a maximum ten feet wide even with the mirrors extended. That means another ten feet for the

cars that are parked there. A typical passenger car is, at most—or [a sports utility vehicle] is at most eight feet wide. So, even if they were not obeying these no parking restrictions and their car was parked there, the fire truck could still get by."[25] Vertucci thus offered his expert opinion that "[a]s far as the town road standards . . . there is nothing from a traffic safety perspective that would require any of these internal roadways to be constructed to the [road ordinance] standards. These drives are extremely low volume roadways. . . . They're not functioning as public roadways and [their] stated width [will] accommodate size for electrical or emergency vehicle traffic as they're designed today. In fact . . . Ames Road, [a public road] which borders the site, is twenty-two feet wide. So, we're designing a road nearly the width of the town roadway that abuts the site . . . ."

Vertucci was the only expert who testified at the public hearing on the risk of harm to public health and safety posed by the proposed roadway. Although the commission's professional staff repeatedly noted that the proposed roadway did not comply with the minimum width and maximum grade requirements of the road ordinance, they did not submit any evidence of specific harm that likely would result therefrom, nor did they opine that the proposed roadway was unsafe. As this court has noted, "[t]he narrow rigorous standard of § 8-30g dictates that the commission cannot deny an application on broad grounds such as noncompliance" with a municipal legislative enactment. *Wisniowski* v. *Planning Commission*, supra, 37 Conn. App. 314. Although the commission's professional staff opined that the standards set forth in the road ordinance provide for "generally safer access" and "an appropriate higher level of safety," the statutory imperative of § 8-30g (g) (1) (A) involves a question of necessity, not reasonableness. See *Eureka V, LLC* v. *Planning & Zoning Commission*, 139 Conn. App. 256, 275, 57 A.3d 372 (2012).

The burden placed on the commission in an affordable housing appeal requires it to prove, inter alia, that its denial of an affordable housing application was "*necessary* to protect substantial public interests" and that "such public interests *clearly* outweigh the need for affordable housing . . . ." (Emphasis added.) General Statutes § 8-30g (g) (1) (A) and (B); see also *Wisniowski* v. *Planning Commission*, supra, 37 Conn. App. 306–307. The administrative record before us lacks evidence indicating that strict compliance with the minimum road width and maximum grade requirements of the road ordinance was necessary to protect the public health and safety on the proposed roadway or that the need for such compliance clearly outweighed the need for affordable housing in Lisbon.[26]

Furthermore, we note that, in discussing the commis-

sion's burden to demonstrate such necessity under § 8-30g, our Supreme Court has held that the administrative record must contain evidence in the record "concerning the probability that such harm in fact would occur." *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 156; see also *AvalonBay Communities, Inc.* v. *Zoning Commission*, 130 Conn. App. 36, 58, 21 A.3d 926 (record must contain evidence as to quantifiable probability that specific harm will result if application is granted), cert. denied, 303 Conn. 909, 32 A.3d 962 (2011). The commission has identified no such evidence regarding the probability of harm to the public health and safety in the record here.[27]

*Mackowski* v. *Zoning Commission*, 59 Conn. App. 608, 757 A.2d 1162, cert. granted, 254 Conn. 949, 762 A.2d 902 (2000) (appeal withdrawn September 21, 2001), is instructive in this regard. In *Mackowski*, this court concluded that the defendant commission had "failed to meet its burden of proving . . . that its denial of the plaintiffs' application was necessary to protect substantial public interests in health, safety or other matters that the commission may legally consider." Id., 616. We reasoned that "[t]he commission never addressed the traffic and sewage concerns in detail; rather, it made generalized statements concerning the adverse impacts on the health, safety and welfare of the community that would be created by the project and remarked that those adverse impacts appeared to be unnecessary in achieving affordability for this development. The evidence before the commission . . . established that there would be no significant problems with traffic or the sewer system as a result of the proposed development. Neighbors of the proposed development did express concern with the impact on traffic from the development. While they claimed that at times traffic could be dense at the intersection of the proposed development, there was no record of any specific findings of fact, such as the frequency of the traffic, to support this allegation. Furthermore, while the town engineer expressed concerns regarding the effect that the continued development of the area would have . . . there was no showing that a possibility of substantial harm could ever result." Id., 617.

In the present case, the document prepared by the commission's legal counsel, on which the commission relied in denying the plaintiff's original application, suffers a similar infirmity. It states in relevant part that "no town residents should be obligated to accept roads of lesser quality and safety than anticipated by the . . . road ordinance," but it provides no specific findings of fact as to the harm that would result if the proposed roadway was constructed. The document contains generalized statements that "lesser quality roads would have a tendency to create a variety of problems . . . including: lack of adequate space for parking; difficult or impossible turning movements for emergency vehi-

cles, such as fire apparatus; and extremely steep grades." Yet neither that document nor the commission's decision cite to any evidence as to the severity and probability of such harm. Such generalized concerns cannot support a determination that the commission's decision was necessary to protect the public interest or that the harm outweighed the town's documented need for affordable housing. See *Eureka V, LLC* v. *Planning & Zoning Commission*, supra, 139 Conn. App. 276–77; *Mackowski* v. *Zoning Commission*, supra, 59 Conn. App. 617. In addition, the plaintiff's modified application made several changes in response to those generalized concerns. See footnote 15 of this opinion. The commission's decision to deny the modified application did not include any findings regarding those concerns.

In an affordable housing appeal pursuant to § 8-30g, the commission bears the burden of demonstrating that its denial was necessary to protect a substantial public interest that clearly outweighs the need for affordable housing. When a municipal legislative enactment is involved, the commission—as well as a reviewing court—must look to the rationale behind that enactment to determine whether that standard is satisfied. *Wisniowski* v. *Planning Commission*, supra, 37 Conn. App. 317–18. The explicit purpose of the road ordinance is to protect the public health and safety on roads in Lisbon. The plaintiff's modified application included expert evidence indicating that the proposed roadway did not present any public health or safety concerns. As in *AvalonBay Communities, Inc.* v. *Zoning Commission*, supra, 130 Conn. App. 54, the record in the present case is devoid of specific evidence undermining the expert evidence furnished by the plaintiff.[28] We therefore conclude that the court properly determined that the plaintiff's noncompliance with the road ordinance did not constitute a valid ground on which to deny its modified affordable housing application.

III

The commission also challenges the court's conclusion that the plaintiff's alleged noncompliance with the fire code did not constitute a valid ground on which to deny its affordable housing application. The administrative record before us does not substantiate that claim.

The issue of compliance with the fire code was raised by Rick Hamel, the town's fire marshal. Although Hamel did not testify at the March 5, 2013 public hearing on the plaintiff's modified application, he did provide a letter to the commission dated April 1, 2013, which detailed three manners in which the proposed subdivision allegedly did not comply with the fire code. That letter expressly indicates that Hamel had not reviewed the plaintiff's March 5, 2013 revised plan in reaching those conclusions. In its memorandum of decision, the Superior Court noted that "[t]he parties . . . stipulated

at the argument that [Hamel's] letter was based on the original submission and not the resubmission, which incorporated changes to correct the deficiencies. Because both parties acknowledged [Hamel's] failure to analyze the resubmission with its changes and modifications, the court will not consider the [April 1, 2013] letter . . . ." We see no reason to depart from that sound determination. Hamel concededly had not reviewed the plaintiff's modified application, and therefore could not offer any perspective on whether it complied with the fire code.

The commission also briefly argues that the risk of inadequate snow removal and illegal on street parking could result in "a too narrow road for emergency vehicles." That contention amounts to little more than speculation and conjecture, which "have no place in appellate review."[29] (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009). The plaintiff's modified proposal included a "snow storage plan," with which the revised homeowner's agreement required compliance. The modified proposal also included a condition prohibiting on street parking; that prohibition was memorialized in the homeowner's agreement. See footnote 15 of this opinion. Furthermore, in his expert testimony at the public hearing, Vertucci opined that "[e]ven if there [was] a vehicle parked along a driveway anywhere in the [subdivision, the proposed roadway would] still have the width for a fire truck to get by. Fire trucks are at a maximum ten feet wide even with the mirrors extended. That means another ten feet for the cars that are [illegally] parked there. A typical passenger car is, at most—or even a [sports utility vehicle] is at the most eight feet wide. So, even if they were not obeying these no parking restrictions and their car was parked there, [emergency vehicles] could still get by." The commission has not identified any evidence in the record of a quantifiable probability of specific harm stemming from what, at its essence, is its presumption that citizens will not comply with the various no parking and fire lane designations throughout the subdivision, the requirements set forth in the homeowner's agreement, and the conditions of approval for the subdivision proposed by the plaintiff. Accordingly, it has not satisfied its burden under § 8-30g (g).

IV

As a final matter, the commission contends that the court improperly remanded the matter to it "with direction to grant the plaintiff's resubmission as is." That claim requires us to consider the statutory basis for, and the propriety of, that determination.

Generally, the court's remedial authority is limited in appeals from the decisions of municipal land use agencies. As the Supreme Court recently explained,

"[t]he statutes create a limited role for a trial court hearing an administrative or zoning appeal. . . . Courts hearing such appeals do not sit as courts of equity, but as appellate tribunals. . . . Their power to find facts *and grant relief* is narrow and generally confined to reviewing the validity of the agency decision. . . . Specifically, in zoning appeals, the trial court's reviewing authority is strictly constrained by § 8-8 (*l*) and the substantial evidence rule . . . ." (Citations omitted; emphasis added.) *Hunter Ridge, LLC* v. *Planning & Zoning Commission*, 318 Conn. 431, 445, 122 A.3d 533 (2015); see also *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 708–709, 784 A.2d 354 (2001).

In affordable housing appeals, the court's authority derives not from § 8-8, but from § 8-30g. Section 8-30g (g) provides in relevant part that "[i]f the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." Our Supreme Court has recognized that § 8-30g (g) authorizes a reviewing court "to employ much more expansive remedies than are available to courts in traditional zoning appeals."[30] *AvalonBay Communities, Inc.* v. *Zoning Commission*, 284 Conn. 124, 140 n.15, 931 A.2d 879 (2007); accord *Wisniowski* v. *Planning Commission*, supra, 37 Conn. App. 320 (§ 8-30g "takes away some of the discretion that local commissions have under traditional land use law and allows the reviewing trial court to effect a zone change if the local commission cannot satisfy the statutory requirements for its denial of an application"); R. Fuller, 9B Connecticut Practice Series: Land Use Law and Practice (3d Ed. 2007) § 51.5, p. 175 (§ 8-30g confers "more authority than provided for in other administrative appeals, and the court can direct the agency to approve the project as is or with suggested modifications"); M. Westbrook, "Connecticut's New Affordable Housing Appeals Procedure: Assaulting the Presumptive Validity of Land Use Decisions," 66 Conn. B. J. 169, 194 (1992) (noting that remand provision of § 8-30g "gives the court great latitude" and "several options for providing relief to the developer"). Because the plain language of § 8-30g (g) permits a reviewing court to "wholly or partly revise, modify, remand or reverse the decision" of a commission "in a manner consistent with the evidence in the record," it necessarily confers on the court a degree of discretion. Imparting such discretion on a reviewing court is consonant with the remedial nature of § 8-30g. See *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 140.

Accordingly, our review of the court's exercise of its remand authority under § 8-30g (g) is governed by the abuse of discretion standard.[31] Under that standard, "the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presump-

tion should be given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *Parslow* v. *Zoning Board of Appeals*, 110 Conn. App. 349, 354, 954 A.2d 275 (2008).

In the present case, the court's decision to remand the matter with direction to "grant the plaintiff's resubmission as is" is one consistent with the evidence in the record. The court had before it transcripts of two public hearings that transpired over the course of six days and countless documents regarding the proposed subdivision and revisions thereto. The court also had before it expert testimony from a professional engineer, a transportation engineer, and a land surveyor. The record also encompasses the commission's decision to deny the plaintiff's original application, the plaintiff's modified application and accompanying materials, the materials submitted by the commission's professional staff, and the commission's deliberations and ultimate decision on the modified application. Significantly, that modified application contained numerous conditions of approval proposed in response to concerns raised by the commission and its professional staff.[32] Because the court's remand ordered the commission to grant the modified application "as is," those detailed conditions necessarily are part of that approval, and are binding on the plaintiff. In addition, although the commission in this appeal suggests that the court impaired its ability to attach appropriate conditions to such an approval, it does not specify any additional conditions that it believes are necessary.[33]

In an affordable housing appeal, the authority of the Superior Court to fashion appropriate relief derives from the General Statutes. The court's authority under § 8-30g (g) includes "the power" to order a commission to grant an affordable housing application on remand. *AvalonBay Communities, Inc.* v. *Zoning Commission*, supra, 284 Conn. 140–41 n.15; see also *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 527, 636 A.2d 1342 (1994) (reviewing court's "remedy granting the [affordable housing] application [is] specifically authorized by the plain language of § 8-30g"). Accordingly, the court here was authorized to remand the matter to the commission with direction to grant the modified application "as is." On our review of the evidence in the administrative record, we cannot say that the court could not reasonably reach that determination. See *Parslow* v. *Zoning Board of Appeals*, supra, 110 Conn. App. 354. The court, therefore, did not abuse its discretion in remanding the matter to the commission with direction to grant the plaintiff's modified affordable housing application as is.

The judgment is affirmed.

In this opinion the other judges concurred.

<sup>1</sup> "In hearing appeals from decisions of a planning and zoning commission, the Superior Court acts as an appellate body." *MacKenzie* v. *Planning & Zoning Commission*, 146 Conn. App. 406, 409 n.3, 77 A.3d 904 (2013).

<sup>2</sup> In connection with the proposed development, the plaintiff obtained a permit from the Conservation Commission of the Town of Lisbon to conduct minor regulated activity within the 100 foot upland review area.

<sup>3</sup> It is undisputed that the affordability plan submitted by the plaintiff as part of its application demonstrated that the proposed subdivision satisfied the statutory criteria for an affordable housing development.

<sup>4</sup> "[A] modular home is largely manufactured somewhere away from the eventual home site and brought to the local home site for installation." *Bennett* v. *CMH Homes, Inc.*, 770 F.3d 511, 518 (6th Cir. 2014); see also *Lauderbaugh* v. *Hopewell Township*, 319 F.3d 568, 571 n.2 (3rd Cir. 2003) (modular home "is built off-site in modular components that are transported to a residential site and erected on a permanent foundation"); *Woodstock* v. *Williams*, 1 Conn. App. 505, 506, 473 A.2d 330 (describing modular home as one that is "prefabricated"), cert. denied, 193 Conn. 804, 475 A.2d 1104 (1984). "Unlike a mobile home or house trailer, a modular home is not built on a permanent chassis, and for that reason, it is not able to be readily moved to another location once installed or erected." *Williams* v. *Fox*, 219 S.W.3d 319, 323 (Tenn. 2007).

<sup>5</sup> One lot, shown as "Lot 17" on the plans and surveys submitted to the commission, was designated as "not a proposed building lot." At the time

that the plaintiff's application was before the commission, this lot did not meet the minimum requirements of the Connecticut Public Health Code for sewage disposal "due to high seasonal water levels." The plaintiff nevertheless envisioned an additional single-family home on that lot, pending further groundwater testing and approval by the town sanitarian. The plaintiff's original application proposed, as a condition of approval, that should subsequent testing conducted in the spring of 2013 fail to garner the approval of the town sanitarian, the plaintiff "will file on the land records documentation showing the merging of Lot 17 into an adjacent lot and will notify the [c]ommission." In its modified application, the plaintiff stated that "the [s]anitarian directed the test to be done in spring 2013, and the applicant has agreed. Lot 17 is not proposed as a building lot at this time." Lot 17 thus is not at issue in this appeal.

[6] As the plaintiff notes in its appellate brief, the median home price in Lisbon in 2012 was $179,000.

[7] During the public hearings on the plaintiff's original application and its modified application, the plaintiff's representatives also referred to the proposed roadway as an "internal roadway" system.

[8] Under the plaintiff's proposal, the roadway would remain private and would be maintained by an association comprised of homeowners. Specifics regarding the formation of that association and its corresponding obligations were set forth in the conditions of approval proposed by the plaintiff, as well as the "Homeowner's Agreement for Lots 1-15" drafted by the plaintiff and included in its submissions to the commission.

[9] For purposes of clarity, appended to this opinion is a copy of the roadway proposed by the plaintiff's modified affordable housing application, as depicted on the plan prepared by land surveyor Dieter & Gardner, Inc., and submitted to the commission on March 5, 2013.

[10] The road ordinance officially is known as "An Ordinance Concerning the Construction and Acceptance of Roads in the Town of Lisbon Connecticut." It was adopted by a town meeting convened on June 29, 1995, and became effective on July 19, 1995. Its stated purpose is as follows: "In order to protect the public health and safety, to promote the general welfare, to preserve property values and to assure the orderly growth and development of the Town, the following standards and procedures for the construction of all roads, drainage structures and appurtenances thereto have been adopted by a Town meeting . . . ."

[11] Pursuant to §§ 4.3.1 and 4.4.1 of the road ordinance, the minimum width of a local residential road without curbs is twenty-six feet, and the maximum grade for such a road shall not exceed 10 percent. The roadway originally proposed by the plaintiff was less than twenty feet wide and, at certain locations, contained a grade of 16 percent. Following the denial of its original application, the plaintiff modified its application to provide a twenty foot wide roadway to address various concerns raised by the commission and its staff regarding emergency vehicle access and on street parking on the roadway.

[12] The transcript of the commission's January 8, 2013 deliberations on the plaintiff's application indicates that Zizka began the discussion by reviewing the portion of his document that addressed noncompliance with the road ordinance. When he concluded, the following colloquy transpired:

"[Chairman] Adams: I think we're in pretty much agreement. I'm not sure but we can find out right now. Uh, if there's a problem with the, the width is 16' and 20'. Uh, it should be between 26' and 28'. Movement on the roads pose[s] a problem. Uh my feeling is it should be a town road. It should be accepted as a town road and town road standards. How do you feel about it?

"[Commissioner] Giroux: Ron Giroux. Um, I agree. I think the roads need to be the width of all the other Town roads. I don't think [there are] a lot of houses in there but, you know, we don't even, like, we don't even allow the shared driveway for a simple reason because of egress in and out of those areas.

"[Chairman Adams]: Um, yeah, I have a problem with the, the grades too. I mean, the slopes aren't, um, safety-wise, I think we should adhere to the [road] [o]rdinance.

"[Commissioner] Sperry: Oh, I agree and coming up to the Town road standards would ensure, um, that public safety has adequate access, um, to service the future residents of, you know, to this development and I think that was, um, the fact that emergency vehicles and first responders were able to, um, respond or turn safety concern but not only for the people who live there and would require services but responders as well.

"[Commissioner] Dempsey: Uh, John Dempsey. I feel the same way, especially with the grades. Um, if it was a single house going up into the woods,

that's, that's your prerogative to do that but when you have this many houses with those kind of grades, you're asking the Town of Lisbon's . . . emergency personnel to do something that's pretty risky, not to mention there's, nobody's going to want to plow those roads up or down at those grades, so I feel the same.

"[Commissioner] Ritacco: Gary Ritacco. I feel the same as everybody else here on the maintenance of the Town road.

"[Commissioner] Gabiga: Um, I agree also. I think that, uh, we should adhere to the Town road standards, this development, and then I also feel the, the safety of not only the people who would live there but along the road and also the, um, uh, in the development itself that, uh, the emergency vehicles and, uh, do not have enough turn around and that was the problem [inaudible] and, and enforcing of the parking bans and things like that too.

"[Commissioner] Gagnon: Dave Gagnon. I agree with everything that's been said. You know, the emergency vehicles, the width, urn, and then the fact that the homeowner's association could come back to the town later with that action of making the town do something, so I think, I don't know, that the width is definitely too small and with, you know, the problems that we did, especially the parking too, that we discussed.

"[Zizka]: Okay.

"[Commissioner Giroux]: Yeah, the parking and the, uh, the width of the roads, I definitely agree with and I think it's been presented very well. I just want to make, can I just say one thing, though? Um, a 10 [percent] slope, I mean, we're not all people who know every little detail but a 10 [percent] slope is less than a handicap ramp, okay? I just, you know, because I noticed it was said earlier but a 30 [percent] slope going down a very steep hill grade on the, um, the next thing we're going to talk about in your report and even that is like walking on a 3 $^1$/2 pitch roof. To me, that is not very steep, okay? The way it's presented, okay? Just so because not everybody knows and I look at 10 [percent] slope, what does that mean? Does that mean, you know, I'm going off a cliff? No. It's almost nothing. Just, I just wanted to say that. Thank you.

"[Chairman Adams]: So it sounds like you're in agreement as far as there's a problem with the road, uh, uh, situation. Um, and as written here, to redesign it isn't really our, our job to redesign the way the road's going to look and to try to approve something that we don't know what it's going to look like, it's very difficult to do. Uh, if anybody has any suggestions as to a possible solution besides bringing up the road standards, I'd like to hear it now. Okay, we'll go on to the next one. . . ."

[13] The first issue pertained to the "lack of conformance with town road standards"; the second noted that "[t]he outlet pipe location at Lot 1 does not comply with section 5.1.6 of the town road ordinance"; and the fourth issue was that "the proposed road layout fails to comply with pertinent sections of the [fire code] and . . . the plans do not provide adequate emergency access."

[14] General Statutes § 8-30g (h) provides in relevant part: "Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. . . . The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission shall hold a public hearing on the proposed modification if it held a public hearing on the original application and may hold a public hearing on the proposed modification if it did not hold a public hearing on the original application. The commission shall render a decision on the proposed modification not later than sixty-five days after the receipt of such proposed modification . . . . The commission shall issue notice of its decision as provided by law. Failure of the commission to render a decision within said sixty-five days or subsequent extension period permitted by this subsection shall constitute a rejection of the proposed modification. Within the time period for filing an appeal on the proposed modification as set forth in section 8-8, 8-9, 8-28 or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section. Nothing in this subsection shall be construed to limit the right of an applicant to appeal the original decision of the commission in the manner set forth in this section without submitting a proposed modification or to limit the issues which may be raised in any appeal under this section."

[15] Among other things, the modified application (1) redesigned the pro-

posed roadway "[t]o address the [commission's] claimed concern about fire truck, utility truck, and delivery truck access and turnarounds" by creating an internal loop within the subdivision that was twenty feet wide; (2) revised the "pavement and turning radii for Lots 10 and 14 . . . as requested to eliminate stated concerns about emergency vehicle turning"; (3) reduced certain grades at the behest of the commission's professional staff; (4) revised the placement of wells on the proposed lots "far enough from the common driveway to meet the five foot minimum distance specified by the commission in its denial"; (5) added "a snow storage plan" to the proposal and revised the homeowner's agreement "to require conformance to it"; and (6) "accepted the [commission's] demand to relocate" a storm drainage outlet. In addition, the plaintiff's modified application proposed, as a condition of approval, that "Lots 1 through 15 shall be conveyed with the prohibition from parking motor vehicles of any type in the areas more particularly shown and depicted as 'No Parking Anytime' " on the modified plan. The modified application also contained a revised homeowner's agreement that repeated that language and then stated in relevant part that owners of those lots "hereby grant to the [homeowner's association] a right to enforce any and all parking / no parking / fire lane signage, striping, and restrictions, through the issuance of written notices of violation. The [owners] agree that no structure, landscaping, or impediment will be maintained that will block emergency or service vehicle use of the internal shared [roadway] and individual driveways. . . ."

[16] The record reflects that although the commission received a number of comments from members of the public during the March 5, 2013 public hearing, little discussion pertained to the adequacy of the proposed roadway.

[17] The court also concluded that the commission's claim regarding the proposed road drainage system was without merit. The commission does not challenge that determination in this appeal.

[18] The record indicates that the commission was without the assistance of its legal counsel when it rendered its decision on the plaintiff's resubmitted application on April 2, 2013.

[19] Without question, the better practice is for the land use agency, following its vote on a motion on an affordable housing application, to issue a separate, "formal, official, collective statement of the reasons for its actions." (Internal quotation marks omitted.) *Christian Activities Council, Congregational* v. *Town Council*, supra, 249 Conn. 576. On the facts of this case, which involved a modified affordable housing application that constituted "an amendment to the original proposal"; General Statutes § 8-30g (h); and on which the commission rendered a decision largely identical to its denial of the original application, we conclude that a clear basis for that decision emanates from the motion to deny that was approved by a vote of eight to zero.

[20] As our Supreme Court has noted while discussing the standard embodied in § 8-30g, "[t]he function of the scope of judicial review is to express the policy choice, ordinarily drawn from the governing statutes, regarding the allocation of decision-making authority as between the administrative agency and the reviewing courts, and, more specifically, to articulate the degree of constraint that the statutes place upon the courts in reviewing the administrative decision in question." *Christian Activities Council, Congregational* v. *Town Council*, supra, 249 Conn. 580–81.

[21] "Because the plaintiffs' appeal to the [Superior Court] is based solely on the record, the scope of the [Superior Court's] review of the [commission's] decision and the scope of our review of that decision are the same." (Internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Zoning Commission*, supra, 271 Conn. 26–27 n.15.

[22] Under the road ordinance, the Board of Selectmen is responsible for issuing road construction permits in Lisbon, including "roads in a subdivision approved by the [commission] . . . after the effective date of the road ordinance." Lisbon Road Ordinance § 2.1 (b). The road ordinance defines a "road" as follows: "Road means and includes streets, highways, avenues, lanes laid out and intended as vehicular access way." Lisbon Road Ordinance § 1.3.

[23] At no time during the application process did the plaintiff propose a public road within the affordable housing subdivision adjacent to Ames Road. Rather, the proposed roadway was to be a private one governed by a homeowner's agreement. See footnote 8 of this opinion. Whether such a private roadway ultimately could obtain approval from the Board of Selectmen; see footnote 22 of this opinion; is an issue beyond the purview of this administrative appeal.

[24] Vertucci's January 30, 2013 "traffic safety review" letter indicates that "[t]raffic circulation of passenger vehicles, emergency vehicles, and service/ delivery vehicles was reviewed, as well as the provisions for vehicle turn-

arounds, adequate site roadway width, and snow storage areas on the plan." That analysis "concludes that the [plaintiff's] revised site layout plans will provide for safe traffic operations and do not present any public health or safety concerns."

[25] Among the materials Vertucci submitted to the commission is a depiction of the "Smeal Aerial RM" fire truck, which contains an 80 foot ladder track and measures 38.17 feet long by 8.33 feet wide. Vertucci also provided a detailed "truck turning analysis" predicated on that vehicle's turning radius, given its forty-five degree "steering lock angle." Vertucci submitted those materials at the behest of the commission's professional staff, as that fire truck is the "longest truck" that responds to an emergency in the town.

[26] At oral argument before this court, the commission's counsel was asked if the administrative record in this case contains evidence as to whether a twenty foot wide road presented greater danger to public health and safety than a twenty-six foot wide road. Counsel conceded that it does not.

[27] The commission argues that the plaintiff's noncompliance with the road ordinance obviates the need for the commission, on appeal, to identify evidence in the record as to a quantifiable probability that specific harm will result if the modified application was granted. As it states in its principal appellate brief: "[T]he 'specific harm to the public interest' is the elevated level of risk the proposed development would cause if [the plaintiff's] new road system is allowed to have lower standards than those established by the [road] ordinance. The 'quantifiable probability' that such 'specific harm' would be caused by the approval of such a road is 100 percent; i.e., there is no question that the level of risk will be greater . . . . It should not have been necessary for the [c]ommission to receive evidence about how many additional accidents a narrower road or steeper grades might cause because Lisbon's legislative body had already determined . . . that the additional risk was unacceptable *regardless* of what fractional amount it might involve." (Emphasis in original.) The commission has provided no authority for that assertion. Contra *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 156; *AvalonBay Communities, Inc.* v. *Zoning Commission*, supra, 130 Conn. App. 58.

[28] The commission argues that the court improperly imposed on it the burden to provide expert evidence that the proposed roadway was unsafe. We disagree. In *Carr* v. *Planning & Zoning Commission*, 273 Conn. 573, 605, 872 A.2d 385 (2005), the defendant commission similarly claimed that "the court improperly held that, in order to justify its denial of the modified application, the burden was on the zoning commission to perform studies to determine the extent to which the development would adversely affect the public interest in a safe water supply." Our Supreme Court rejected that claim, stating that the court "did not impose any such burden on the zoning commission." Id. The court reasoned that "the trial court took as its starting point information provided by the plaintiff that the likelihood of [well] interference was extremely remote or nonexistent. Thus, the court did not place the initial burden of establishing that there would be no such interference on the zoning commission. Rather, the trial court determined that, in light of the information provided by the plaintiff, the zoning commission could not deny the modified application unless it established that there was a quantifiable probability of such interference and that reasonable changes to the modified application would not adequately address the problem. . . . [T]his determination was consistent with the requirements of [§ 8-30g] and did not impose any unwarranted burden on the zoning commission." (Citation omitted.) Id., 606. Accordingly, that precedent instructs that once an affordable housing applicant submits evidence indicating that harm to a substantial public interest is unlikely, the commission cannot deny such an application absent specific evidence in the record indicating otherwise. Id., 606–610.

In the present case, the plaintiff provided expert evidence indicating that the proposed roadway did not present any public health or safety concerns. Moreover, the plaintiff's modified application specifically alerted the commission to the fact that, in its view, there was "no expert or other testimony in the record that the proposed driveways are unsafe." Accordingly, to properly deny the plaintiff's modified application, the burden properly was on the commission to establish a quantifiable probability of harm to the public health or safety that outweighed the need for affordable housing and that could not be protected by reasonable changes to the proposed development.

[29] The commission's exhortation aside, we decline to take judicial notice "that 'no parking' signs are often disregarded."

[30] For that reason, the commission's reliance on cases such as *Finley* v. *Inland Wetlands Commission*, 289 Conn. 12, 959 A.2d 569 (2008), *Thorne*

v. *Zoning Commission*, 178 Conn. 198, 423 A.2d 861 (1979), *Bogue* v. *Zoning Board of Appeals*, 165 Conn. 749, 345 A.2d 9 (1974), *Jersey* v. *Zoning Board of Appeals*, 101 Conn. App. 350, 921 A.2d 683 (2007), and *Samperi* v. *Planning & Zoning Commission*, 40 Conn. App. 840, 674 A.2d 432 (1996), is misplaced, as none involved a reviewing court's authority under § 8-30g. Indeed, this court has rejected a claim that a reviewing court "illegally usurped" the administrative authority of a planning and zoning commission in fashioning relief pursuant to § 8-30g. *Wisniowski* v. *Planning Commission*, supra, 37 Conn. App. 308, 319–21.

[31] In its principal appellate brief, the commission agrees that our review of the court's remand order is pursuant to the abuse of discretion standard.

[32] The plaintiff's modified application proposed the following conditions of approval:

"[1]. Prior to the sale of any of Lots 1 through 15, [the plaintiff] will install the common driveway and sightline improvements, drainage, utilities, and signage necessary for access to, construction on, and use of that individual lot as shown on the approved plans, and will provide to the [commission] an as-built plan demonstrating compliance.

"[2]. In accordance with [General Statutes] § 8-25 as amended, [the plaintiff] will post a financial guarantee, in an amount to be determined with the Town Engineer, for erosion and sedimentation controls and the drainage from the Ames Road culvert to the outlet at the northwest corner of Lot 2.

"[3]. Each of Lots 1 to 15 will be conveyed in deeds that will include, and will be subject to, cross-easements as follows:

"a. Lots 1, 2, 11, and 15 will be conveyed together with the non-exclusive perpetual easements for access, maintenance, and utilities as more particularly shown and depicted on Sheets 2 and 3 of the 'Plan Showing The Residences At Lisbon Property Of Brenmor Properties LLC, Connecticut State Route 169 A.K.A. South Burnham Highway And Ames Road, Lisbon, Connecticut. Scales As Shown May 2012' comprised of Sheets 1 through 9A last revised 1/21/13 (hereinafter the 'Plan').

"b. Lots 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, and 14 will be conveyed subject to and together with the non-exclusive perpetual easements for access, maintenance, and utilities as more particularly shown and depicted on Sheets 2 and 3 of the Plan.

"c. Lots 1 through 15 shall be conveyed with the prohibition from parking motor vehicles of any type in the areas more particularly shown and depicted as "No Parking Anytime" areas on Sheets 2 and 3 of the Plan.

"d. Lots 1, 2, 4, 7, and 15 shall be conveyed subject to a Drainage Easement (including access and maintenance) in favor of the Town of Lisbon as more particularly shown and depicted on Sheets 1, 2, and 3 of the Plan.

"e. Lots 3, 5, and 14 shall be conveyed subject to emergency ingress and egress easement rights as more particularly shown and depicted on Sheets 2 and 3 of the Plan.

"f. Lot 10 shall be conveyed subject to an easement for common driveway for ingress and egress to the site as more particularly shown and depicted on Sheet 2 of the Plan.

"g. Lot 10 shall be conveyed subject to a temporary construction entrance easement as more particularly shown and depicted on Sheet 2 of the Plan.

"[4]. A condition of subdivision approval and the eventual sale of each Lot 1 to Lot 15 will be formation by [the plaintiff] of a Homeowners Association, using the form of Agreement submitted to the [c]ommission. The purchaser of each Lot 1 to 15 will agree to the Homeowners Association Agreement as a condition of purchase. Upon sale of the first lot of Lots 1 to 15, [the plaintiff] will provide initial funding of the Homeowners Association in the amount of $2,500, for the purpose of funding for one season snow plowing and driveway clearance (estimated at $200 per plow, 12 snow events). Thereafter, each owner of a lot that is not subject to § 8-30g income and sale / resale price restrictions, will pay a minimum of $40 per month to the Association, and the owners of those lots that are subject to § 8-30g will pay a minimum of $25 per month, but a maximum only as allowed by §§ 8-30g-1 et seq. of Connecticut State Agency Regulations. Funds collected by the Homeowners Association in excess of snow removal and regular maintenance shall be deposited in a capital reserve fund for the purpose of periodic repair of the driveway, common utilities, or drainage.

"[5]. Well locations shown on the approved plan are schematic. Wells may be located where allowed by the Health Code, and will be approved on a lot-by-lot basis by the Sanitarian. Each proposed well will need to demonstrate sufficient yield before a Certificate of Occupancy is issued.

Wells will be located so as to not be subject to damage by vehicles, including emergency and service vehicles, traveling on the internal driveways.

"[6]. School bus pick-ups for Lots 1–15 will occur at a location along Ames Road to be determined in conjunction with the Board of Education staff."

[33] We note that a reviewing court may—but is not obligated to—remand an affordable housing application to a land use commission with direction that the application "be approved under such terms and conditions as the commission might reasonably prescribe within the parameters of" the reviewing court's ruling. (Internal quotation marks omitted.) *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 167.